[No. S162818. June 11, 2009.]

KENNETH MUNSON, Plaintiff and Respondent, v.
DEL TACO, INC., Defendant and Appellant.

## COUNSEL

Call, Jensen & Ferrell, Scott J. Ferrell, Lisa A. Wegner and Melinda Evans for Defendant and Appellant.

Baraban & Teske, Jeffrey H. Baraban, Christopher S. Teske and James S. Link for Los Burritos, Inc., as Amicus Curiae on behalf of Defendant and Appellant.

Law Office of Anthony T. Caso and Anthony T. Caso for National Federation of Independent Business Small Business Legal Center as Amicus Curiae on behalf of Defendant and Appellant.

Center for Disability Access, Mark D. Potter, Russell C. Handy; Law Offices of Lynn Hubbard and Scottlynn J. Hubbard IV for Plaintiff and Respondent.

Brad Seligman, Jason Tarricone; and Ann Menasche for California Council of the Blind, California Foundation for Independent Living Center, Californians

for Disability Rights, Disability Rights Advocates, Disability Rights California, Disability Rights Education & Defense Fund, Disability Rights Legal Center, Impact Fund and Legal Aid Society—Employment Law Center as Amici Curiae on behalf of Plaintiff and Respondent.

Lambda Legal Defense and Education Fund, Inc., Tara L. Borelli and Scott A. Schoettes for Aids Legal Referral Panel, Asian and Pacific Islander Wellness Center, Bienestar, Black Coalition on Aids, Common Ground-Westside HIV Community Center, Face to Face Sonoma County Aids Network, HIV/Aids Legal Services Alliance, L.A. Gay & Lesbian Center, Resources for Indian Student Education, Inc., San Francisco Aids Foundation, San Joaquin Aids Foundation and Sierra Health Resources, Inc., as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**WERDEGAR, J.**—Pursuant to rule 8.548 of the California Rules of Court,[1] we granted the request of the United States Court of Appeals, Ninth Circuit to decide the following questions of California law, as we have rephrased them (see Cal. Rules of Court, rule 8.548(f)(5)): "(1) 'Must a plaintiff who seeks damages under California Civil Code section 52, claiming the denial of full and equal treatment on the basis of disability in violation of the Unruh Civil Rights Act (Civ. Code, § 51) and the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.), prove "intentional discrimination" '? (2) 'If the answer to Question 1 is "yes," what does "intentional discrimination" mean in this context?' "

Although we held in *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1175 [278 Cal.Rptr. 614, 805 P.2d 873] (*Harris*) that proof of intentional discrimination was necessary to establish a violation of the Unruh Civil Rights Act, the Legislature subsequently added subdivision (f) to Civil Code section 51,[2] specifying that "[a] violation of the right of any individual under the Americans with Disabilities Act of 1990" (ADA)—which does not necessarily require a plaintiff to show intentional discrimination—"shall also

---

[1] "On request of the United States Supreme Court, a United States Court of Appeals, or the court of last resort of any state, territory, or commonwealth, the Supreme Court may decide a question of California law if: [¶] (1) The decision could determine the outcome of a matter pending in the requesting court; and [¶] (2) There is no controlling precedent." (Cal. Rules of Court, rule 8.548(a).)

[2] All further unspecified statutory references are to the Civil Code.

constitute a violation of this section." In *Lentini v. California Center for the Arts* (9th Cir. 2004) 370 F.3d 837, 846–847 (*Lentini*), the federal court held section 51, subdivision (f) added ADA violations, whether or not involving intentional discrimination, to the class of discriminatory acts for which the Unruh Civil Rights Act provides a remedy in damages. In *Gunther v. Lin* (2006) 144 Cal.App.4th 223 [50 Cal.Rptr.3d 317] (*Gunther*), however, the Court of Appeal, expressly disagreeing with *Lentini*, held that while an unintentional ADA violation was by virtue of section 51, subdivision (f) a violation of that section, no damages remedy under section 52 is available for such a violation. (*Gunther*, at pp. 239–242, 255–257.)

On examining the language, statutory context, and history of section 51, subdivision (f), we conclude *Lentini*'s interpretation was right and *Gunther*'s was wrong. The Legislature's intent in adding subdivision (f) was to provide disabled Californians injured by violations of the ADA with the remedies provided by section 52. A plaintiff who establishes a violation of the ADA, therefore, need not prove intentional discrimination in order to obtain damages under section 52. In light of that conclusion, we need not reach the Ninth Circuit's second question.

### FACTUAL AND PROCEDURAL BACKGROUND

The order of the Ninth Circuit Court of Appeals asking this court to decide questions of California law sets out the background of this case:

"Plaintiff Kenneth Munson has a physical disability that requires that he use a wheelchair. Plaintiff alleges that he visited the Del Taco restaurant in San Bernardino, California, which is owned and operated by Defendant Del Taco, Inc. Plaintiff further alleges that, at the Del Taco restaurant, he encountered architectural barriers that denied him legally required access to the parking area and restrooms.[3]

---

[3] In the federal district court, Munson conceded his primary complaint was access to the restaurant's restroom, the doorway of which was too narrow to allow wheelchair passage. As a result, he had to go across the street to another business to use the restroom. He also asserted (based on photographic evidence) that the restroom itself was not adequately designed for a wheelchair user and (from his own experience) that the absence of a level clearance in front of the restaurant door required him to " 'hang on to the door handle . . . and drag [him]self into the restaurant while hanging on to the door handle to avoid rolling back down the [ramp] slope.' " (*Munson v. Del Taco, Inc.* (C.D.Cal., July 27, 2006, No. CV05-5942-AHM) 2006 WL 4704611, p. *1, fn. 2.) After Munson filed his complaint, Del Taco, Inc., remodeled the restaurant (unaltered since its construction in 1981) to correct these and other problems, at a total cost of around $66,000. (*Ibid.*)

"Plaintiff filed suit against Defendant in the Central District of California. He alleged violations of the Americans with Disabilities Act of 1990 ('ADA'), 42 U.S.C. §§ 12101–12213, and the Unruh [Civil Rights] Act, Cal. Civ. Code § 51. Plaintiff sought injunctive relief, damages, and attorney fees under California Civil Code section 52 for the alleged Unruh Act violations.

"On cross-motions for summary judgment, the district court granted partial summary judgment in favor of Plaintiff. The court reasoned that 'there is no genuine issue of fact that an architectural barrier existed' and that 'there is no genuine issue of fact that the restroom doorway widening was readily achievable.' Consequently, the court ruled 'that there is no genuine issue of fact that an ADA violation occurred. Thus, [Defendant] is liable under the Unruh [Civil Rights] Act and [Plaintiff] is entitled to pursue statutory damages.'

"The parties stipulated to $12,000 in damages under the Unruh [Civil Rights] Act in lieu of holding a jury trial on the issue, with Defendant reserving the right to appeal any adverse orders or judgments. The district court entered judgment, and Defendant timely appealed the district court's grant of Plaintiff's motion for partial summary judgment.

"Defendant argues on appeal that it is entitled to summary judgment because intent is required under the Unruh [Civil Rights] Act and Plaintiff failed to put forth any evidence that Defendant intentionally discriminated against him. Plaintiff does not contend that he provided evidence that Defendant was motivated by animus against people with disabilities, but argues that such intent is not required or, in the alternative, that the requisite intent is the intent not to remove barriers to access where readily achievable." (*Munson v. Del Taco, Inc.* (9th Cir. 2008) 522 F.3d 997, 999–1000, fn. omitted.)

### DISCUSSION

As always in interpreting statutes, our goal is "to ascertain the Legislature's intent so as to give effect to the law's purpose." (*In re Corrine W.* (2009) 45 Cal.4th 522, 529 [87 Cal.Rptr.3d 691, 198 P.3d 1102].) With regard to the Unruh Civil Rights Act particularly, we recently explained that it "must be construed liberally in order to carry out its purpose" to "create and preserve a nondiscriminatory environment in California business establishments by 'banishing' or 'eradicating' arbitrary, invidious discrimination by such establishments." (*Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 167 [59 Cal.Rptr.3d 142, 158 P.3d 718].) The Unruh Civil Rights Act "serves as a preventive measure, without which it is recognized that businesses might fall into discriminatory practices." (*Angelucci*, at p. 167.)

## I.  *Statutory Background*

We begin by identifying and describing the pertinent provisions of California law and the ADA.

Section 51 provides, in pertinent part: "(a) This section shall be known, and may be cited, as the Unruh Civil Rights Act. [¶] (b) All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever. [¶] . . . [¶] (f) A violation of the right of any individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) shall also constitute a violation of this section."

Section 52 provides, in pertinent part: "(a) Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51, 51.5, or 51.6, is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51, 51.5, or 51.6."

As we explained in *Harris, supra,* 52 Cal.3d at pages 1150–1152, sections 51 and 52 were originally enacted in 1905 (based on predecessor statutes) and were substantially revised in 1959, when the name "Unruh Civil Rights Act" was added. (Stats. 1905, ch. 413, §§ 1, 2, pp. 553–554; Stats. 1959, ch. 1866, §§ 1, 2, p. 4424.) While section 51's statement of the substantive scope of protections afforded and section 52's statement of the remedies available have both changed over the course of time, section 51 has always provided substantive protection against invidious discrimination in public accommodations, without specifying remedies, and section 52 has always provided remedies, including a private action for damages, for violations of section 51.[4] In *Harris,* therefore, we considered the two sections as interrelated parts of the same statutory scheme (we referred to them

---

[4] In their 1905 forms, for example, section 51 provided that all citizens are entitled to "full and equal" treatment in "places of public accommodation or amusement," while section 52 provided that "[w]hoever violates any of the provisions of the last preceding section" by denying such equal treatment was liable for "damages in an amount not less than fifty dollars, which may be recovered in an action at law brought for that purpose." (Stats. 1905, ch. 413, §§ 1, 2, pp. 553–554.) In their 1959 forms, section 51 provided that all citizens within the state "are free and equal" and regardless of "race, color, religion, ancestry, or national origin" are entitled to full and equal treatment "in all business establishments of every kind whatsoever," while section 52 provided that "[w]hoever denies" such treatment "contrary to the provisions

together as "the Unruh Act"), with section 52 serving "to provide an enforcement mechanism for section 51 and other provisions of law." (*Harris*, at p. 1153; see *id.* at pp. 1148, 1151; accord, *Angelucci v. Century Supper Club, supra*, 41 Cal.4th at p. 166 [stating, with reference to § 52, "The [Unruh Civil Rights] Act includes an enforcement provision that authorizes individual actions."].)[5]

In the portion of *Harris* particularly relevant here, we rejected the plaintiffs' claim that a residential landlord's minimum income policy for prospective renters violated the Unruh Civil Rights Act because it had a disparate impact on women. We held the disparate impact test employed in federal and state employment discrimination cases was inconsistent with the language of the Unruh Civil Rights Act, several parts of which "point to an emphasis on intentional discrimination." (*Harris, supra*, 52 Cal.3d at p. 1172.) In particular, we noted section 52's references to "aid[ing]" and "incit[ing]" denials of equal treatment, to "making discriminations," and to commission of an "offense," and further reasoned that section 52's provisions for minimum and exemplary damages reflected a legislative focus on "intentional and morally offensive conduct." (*Harris*, at p. 1172.) We also observed that a disparate impact test appeared to conflict with an exemption in former section 51 for standards " 'applicable alike to persons of every sex, color, race, religion, ancestry, national origin, or blindness or other physical disability.' " (*Harris*, at p. 1172; see current § 51, subd. (c).) From these linguistic indications and the Unruh Civil Rights Act's history and relationship to other statutes (see *Harris*, at pp. 1172–1174), we concluded that "a plaintiff seeking to establish a case under the Unruh Act must plead and prove intentional discrimination in public accommodations in violation of the terms of the Act" (*Harris*, at p. 1175).

In 1992, the year after our decision in *Harris* (though not, as far as the history indicates, in response to that decision), the Legislature amended section 51 to, among other changes, add the paragraph that became subdivision (f), specifying that "[a] violation of the right of any individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) shall also constitute a violation of this section." (Stats. 1992, ch. 913, § 3, pp. 4283, 4284; see Stats. 2000, ch. 1049, § 2 [adding subdivision designations].) This amendment was but one part of a broad enactment, originating as Assembly Bill No. 1077 (1991–1992 Reg. Sess.), that sought to conform many aspects of California law relating to disability discrimination (in employment, government services, transportation, and communications, as well as public

of Section 51" was liable for $250 per offense, as well as "actual damages . . . suffered by any person denied the rights provided in Section 51 of this code." (Stats. 1959, ch. 1866, §§ 1, 2, p. 4424.)

[5] Although this court and others have referred to both sections 51 and 52 as the Unruh Civil Rights Act, the statutory label applies more precisely only to section 51. (See § 51, subd. (a).)

accommodations) to the recently enacted ADA, which was soon to go into effect. (See Assem. Com. on Judiciary, Rep. on Assem. Bill No. 1077 (1991–1992 Reg. Sess.) as amended Jan. 6, 1992, pp. 1–4 [digest] (hereafter Assembly Judiciary Report on Assembly Bill No. 1077).) The general intent of the legislation was expressed in an uncodified section: "It is the intent of the Legislature in enacting this act to strengthen California law in areas where it is weaker than the Americans with Disabilities Act of 1990 (Public Law 101-336) and to retain California law when it provides more protection for individuals with disabilities than the Americans with Disabilities Act of 1990." (Stats. 1992, ch. 913, § 1, p. 4282.)

The Assembly Judiciary Report on Assembly Bill No. 1077 summarized the bill's changes to the Unruh Civil Rights Act as follows: "Include persons with mental disabilities in the enumerated classes of individuals protected by the Unruh Act. [¶] . . . Make a violation of the ADA a violation of the Unruh Act. Thereby providing persons injured by a violation of the ADA with the remedies provided by the Unruh Act (e.g., right of private action for damages)." (Assem. Judiciary Rep. on Assem. Bill No. 1077, *supra*, at p. 2.) The corresponding Senate report put forward substantially the same analysis of the bill's effect on Unruh Civil Rights Act claims: "(1) Existing law, the Unruh Civil Rights Act, entitles protected groups, including blind and physically disabled persons, to full and equal accommodation, advantages, facilities, privileges, or services in all business establishments. [¶] This bill would include persons with mental disabilities in the enumerated classes of individuals protected by the Unruh Act. [¶] In addition, this bill would make a violation of the ADA a violation of the Unruh Act. Thereby providing persons injured by a violation of the ADA with the remedies provided by the Unruh Act (e.g., right of private action for damages . . .)." (Sen. Com. on Judiciary, Rep. on Assem. Bill No. 1077 (1991–1992 Reg. Sess.) as amended June 1, 1992, p. 5 (hereafter Senate Judiciary Report on Assembly Bill No. 1077).)

The ADA's public accommodations provisions are contained in title III of that law (42 U.S.C. §§ 12181–12189). This part of the ADA prohibits, among other things, the "failure to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable." (42 U.S.C. § 12182(b)(2)(A)(iv).)[6] Intentional discrimination need not be shown to establish a violation of the ADA's access requirements, for Congress, in the ADA, sought to eliminate all forms of invidious discrimination against

---

[6] "The term 'readily achievable' means easily accomplishable and able to be carried out without much difficulty or expense." (42 U.S.C. § 12181(9).) Pursuant to the ADA's provision for issuance of regulations (42 U.S.C. § 12186(b)), the federal government has issued ADA Accessibility Guidelines for Buildings and Facilities that set forth standards of design and construction to ensure the disabled access to public accommodations (28 C.F.R. § 36, appen. A (2008)).

individuals with disabilities, including not only "outright intentional exclusion," but also "the discriminatory effects of architectural, transportation, and communication barriers" and the "failure to make modifications to existing facilities." (42 U.S.C. § 12101(a)(5) [congressional finding]; see *Lentini, supra*, 370 F.3d at pp. 846–847.) Although the Attorney General of the United States may seek damages on the aggrieved person's behalf, in a private action for violation of title III no damages—only injunctive relief—are available. (42 U.S.C. § 12188(a), (b)(2)(B); *Wander v. Kaus* (9th Cir. 2002) 304 F.3d 856, 858.)

With this background on the statutes involved, the issue is easily framed: May an Unruh Civil Rights Act plaintiff relying on subdivision (f) of section 51 obtain damages for denial of full access to a business establishment in violation of the ADA and the Unruh Civil Rights Act without proof the denial involved intentional discrimination? We conclude that a plaintiff proceeding under section 51, subdivision (f) may obtain statutory damages on proof of an ADA access violation without the need to demonstrate additionally that the discrimination was intentional.

## II. *Statutory Language and Context*

█ We begin with the statutory language, viewed in light of the entire legislative scheme of which it is a part, as the language chosen is usually the surest guide to legislative intent. (*In re Corrine W., supra*, 45 Cal.4th at p. 529.) To the extent we find the statutory language susceptible of more than one reasonable interpretation, we examine other sources, including the history of the provision's enactment, for insight into the Legislature's intent. (*Ibid.*; *Elsner v. Uveges* (2004) 34 Cal.4th 915, 929 [22 Cal.Rptr.3d 530, 102 P.3d 915].)

Subdivision (f) of section 51 provides that "[a] violation of the right of any individual" under the ADA is also a violation of section 51. The subdivision does not distinguish between those ADA violations involving intentional discrimination and those resulting, in the words of the federal law, from "the discriminatory effects of architectural, transportation, and communication barriers" and the "failure to make modifications to existing facilities." (42 U.S.C. § 12101(a)(5).) The remedies for violation of section 51— specified in section 52—include a private action for damages. A reasonable interpretation of section 51, subdivision (f) is, therefore, that it, together with section 52, authorizes a private action for damages for ADA violations without proof of intentional discrimination. This is the reading embraced by the *Lentini* court (*Lentini, supra*, 370 F.3d at pp. 846–847) and urged on us by plaintiff.

On the other hand, subdivision (f) of section 51 states only that an ADA violation is also "a violation of this section," i.e., of section 51. Section 51 does not, in itself, establish any remedy for its violation. And section 52 does not expressly state that its remedies apply to every violation of section 51. Instead, section 52 applies its remedies to any person who "denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51," language we read in *Harris* as connoting intentional discrimination. (*Harris, supra,* 52 Cal.3d at p. 1172.) As a purely *linguistic* matter, therefore, another reasonable interpretation of section 51, subdivision (f) is that it makes all violations of the ADA violations of section 51 but, together with section 52, authorizes a private action for damages under the Unruh Civil Rights Act only for ADA violations involving intentional discrimination. This is the reading embraced by the *Gunther* court (*Gunther, supra,* 144 Cal.App.4th at pp. 234–235) and urged on us by defendant.

Although linguistically admissible, *Gunther*'s reading of the statute is not consistent with our understanding of the Unruh Civil Rights Act as elucidated in *Harris,* or with the law's history. As noted earlier, sections 51 and 52 have, throughout their history, functioned as an integral legal scheme; section 51 has defined the civil rights of Californians to equal treatment in public accommodations, and section 52 has established the liabilities of those who violate such civil rights. Section 52 has always referred expressly to violations of section 51 and provided remedies for those violations. As we said in *Harris,* section 52 "provide[s] an enforcement mechanism for section 51." (*Harris, supra,* 52 Cal.3d at p. 1153.)

In *Harris,* we analyzed the statutory scheme as a whole—including both sections 51 and 52—and concluded a violation of that law could not be established on a disparate impact theory. Our holding in *Harris* was not that *section 52* required proof of intentional discrimination in order to obtain *damages,* but that "a plaintiff seeking *to establish a case under the Unruh Act* must plead and prove intentional discrimination . . . ." (*Harris, supra,* 52 Cal.3d at p. 1175, italics added.) In reaching this conclusion, we relied on a provision of section 51 providing that application of neutral standards does not violate the law and on the entire history of the Unruh Civil Rights Act, as well as on the particular language of section 52. (*Harris,* at pp. 1172–1174.) Nowhere in *Harris* did we suggest that unintentional discrimination would violate section 51, but would not support an action for damages under section 52. Rather, we held that unintentional discrimination did not violate the Unruh Civil Rights Act *at all.*

The *Gunther* court misread our *Harris* decision as interpreting section 52 only, hence unaffected by the addition of subdivision (f) to section 51. (See *Gunther, supra,* 144 Cal.App.4th at pp. 233–235.) As a federal court (which

followed *Lentini* and disagreed with *Gunther*) explained, "Conceptually . . . *Gunther* envisions a two-step process for obtaining damages: first, the plaintiff must prove that the defendant engaged in discrimination, Cal. Civ. Code § 51, and second, that the discrimination was intentional, Cal. Civ. Code § 52." (*Wilson v. Haria and Gogri Corp.* (E.D.Cal. 2007) 479 F.Supp.2d 1127, 1137.) Because the 1992 amendment that added subdivision (f) to section 51 made no substantial changes to the language of section 52 relied on in *Harris*, the *Gunther* court believed that amendment did nothing to affect *Harris*'s requirement of intentional discrimination. (*Gunther*, at p. 234.) But *Gunther*'s distinction between violations of section 51 and violations of section 51 *warranting a remedy under section 52* is without historical support. Section 52 has always provided remedies for violations of section 51, and our holding in *Harris* concerned *both* sections. The most natural reading of the statutory language—that section 52 provides remedies for all categories of discrimination prohibited under section 51—is also the reading that best accords with the law's history.

Section 52 authorizes a damages action against any person who "makes any discrimination . . . contrary to Section 51." By adding subdivision (f) to section 51, making all ADA violations—whether or not involving intentional discrimination—violations of the Unruh Civil Rights Act as well, the Legislature included ADA violations in the category of "discrimination" contrary to section 51, thus making them remediable under section 52. As the *Lentini* court explained, quoting an earlier district court decision, " 'Because the Unruh Act has adopted the full expanse of the ADA, it must follow, that the same standards for liability apply under both Acts.' " (*Lentini, supra*, 370 F.3d at p. 847.) The effect was to create an exception to *Harris*'s holding that "a plaintiff seeking to establish a case under the Unruh [Civil Rights] Act must plead and prove intentional discrimination . . . ." (*Harris, supra*, 52 Cal.3d at p. 1175.)

### III. *Legislative History*

We also find compelling evidence of legislative intent in the legislative history of the 1992 amendment, Assembly Bill No. 1077 (1991–1992 Reg. Sess.). As noted, Assembly members were told that by adding subdivision (f) to section 51 the bill would "[m]ake a violation of the ADA a violation of the Unruh Act. *Thereby providing persons injured by a violation of the ADA with the remedies provided by the Unruh Act (e.g., right of private action for damages).*" (Assem. Judiciary Rep. on Assem. Bill No. 1077, *supra*, at p. 2, italics added.) Senators were told "this bill would make a violation of the ADA a violation of the Unruh Act. *Thereby providing persons injured by a violation of the ADA with the remedies provided by the Unruh Act (e.g., right of private action for damages . . .).*" (Sen. Judiciary Rep. on Assem. Bill No. 1077, *supra*, at p. 5, italics added.)

The ADA, as explained above, permits a disabled individual denied access to public accommodations to recover damages in a government enforcement action only, not through a private action by the aggrieved person. But by incorporating the ADA into the Unruh Civil Rights Act, California's own civil rights law covering public accommodations, which does provide for such a private damages action, the Legislature has afforded this remedy to persons injured by a violation of the ADA. The legislative history shows the Legislature contemplated and intended this effect, for, as both the legislative committee reports quoted above state, one purpose of the legislation was to "provid[e] persons injured by a violation of the ADA with the remedies provided by the Unruh Act," including a "right of private action for damages." Contrary to the *Gunther* court's reading, therefore, the evidence is clear that the 1992 law was intended not only to prohibit ADA violations under section 51, but when such violations occur to provide a damages remedy under section 52.[7]

The legislative history, true, does not explicitly mention ADA violations that do not involve intentional discrimination. But neither does it mention those that do. Rather, like the language of the amendment itself, it demonstrates an intent to incorporate ADA accessibility standards comprehensively into the Unruh Civil Rights Act and thus to provide a damages remedy for *any* violation of the ADA's mandate of equal access to public accommodations. That broad remedial intent covers the particular circumstance before us.

Any doubt remaining after examination of the language, context, and history of section 51, subdivision (f) would be resolved by the principle that the Unruh Civil Rights Act "must be construed liberally in order to carry out its purpose," which is to "create and preserve a nondiscriminatory environment in California business establishments." (*Angelucci v. Century Supper Club, supra*, 41 Cal.4th at p. 167.) The Legislature having decided, in the 1992 amendment, to pursue the Unruh Civil Rights Act's goal of equality by incorporating ADA accessibility law into California's own law, in the absence of contrary legislative direction we may not choose a restrictive reading of that amendment over a reasonable reading that gives full effect to the law's guarantees.

We turn to two of the main reasons defendant and the *Gunther* court gave for their interpretation: the relationship between the Unruh Civil Rights Act and similar legislation, and the goal of curbing abusive litigation practices.

[7] Although *Gunther* discusses the legislative history of Assembly Bill No. 1077 (1991–1992 Reg. Sess.) at length, citing among other sources these reports of the two houses' judiciary committees (*Gunther, supra*, 144 Cal.App.4th at pp. 244–249), the decision, inexplicably, fails to address the directly pertinent passages quoted above.

IV. *Relationship to Other Statutes*

The *Gunther* court relied heavily on what it perceived as a deliberate legislative choice to require proof of intentional discrimination under the Unruh Civil Rights Act, pursuant to which plaintiffs recover minimum damages of $4,000 (see § 52, subd. (a)), while allowing unintentional ADA access violations to be remedied under the Disabled Persons Act (§§ 54–55.3),[8] another California statutory scheme guaranteeing access to individuals with disabilities, which provides for minimum damages of only $1,000 (see § 54.3, subd. (a)). (*Gunther, supra*, 144 Cal.App.4th at pp. 239–242.) The court believed that under its interpretation of the Unruh Civil Rights Act, "the two statutes dovetail nicely. Where there is intentional discrimination, there is a four times larger minimum penalty; if there isn't, plaintiff still recovers, but less." (*Gunther*, at p. 242.)

Historically, however, it could not have been the Legislature's intent to create the contrasting set of remedies *Gunther* describes. That is because in 1992, when the Legislature added subdivision (f) to section 51, making violations of the ADA violations of the Unruh Civil Rights Act as well (and doing the same for the Disabled Persons Act by adding subd. (d) to § 54.1), *the minimum damages under the two laws were identical, $250.* (Historical and Statutory Notes, 6 West's Ann. Civ. Code (2007 ed.) foll. § 52, pp. 577–578; Historical and Statutory Notes, 6A West's Ann. Civ. Code (2007 ed.) foll. § 54.3, p. 21; Stats. 1976, ch. 366, § 2, p. 1013; Stats. 1981, ch. 395, § 1, pp. 1582, 1583.) The 1992 amendment could not, therefore, have been intended to balance a greater scienter requirement in section 52 with greater minimum damages, as the *Gunther* court imagined.[9]

---

[8] Part 2.5 of division 1 of the Civil Code, currently consisting of sections 54 to 55.3, is commonly referred to as the "Disabled Persons Act," although it has no official title. (See, e.g., *Gunther, supra*, 144 Cal.App.4th at p. 239; *Wilson v. Haria and Gogri Corp., supra*, 479 F.Supp.2d at pp. 1135, 1139–1140.) Sections 54 and 54.1 generally guarantee individuals with disabilities equal access to public places, buildings, facilities and services, as well as common carriers, housing and places of public accommodation, while section 54.3 specifies remedies for violations of these guarantees, including a private action for damages. In a decision predating *Harris, supra*, 52 Cal.3d 1142, the Court of Appeal held such an action did not require proof of an intent to discriminate. (*Donald v. Cafe Royale, Inc.* (1990) 218 Cal.App.3d 168, 176–180 [266 Cal.Rptr. 804]; see also *Lonberg v. City of Riverside* (C.D.Cal. 2004) 300 F.Supp.2d 942, 949–951 [despite some similarity between the language of § 54.3 and that of § 52 relied on in *Harris*, differences in the histories and other provisions of the two statutory schemes suggest *Harris* did not implicitly overrule *Donald v. Cafe Royale, Inc.*].)

[9] Nor does the subsequent amendment history of the two statutes suggest any such intent on the part of later Legislatures. In 1994, the section 52 minimum was raised to $1,000 and that of section 54.3 to $750 (in a different enactment), but the latter was raised to $1,000 two years later. (Stats. 1994, ch. 535, § 1, p. 2760; Stats. 1994, ch. 1257, § 4, p. 7894; Stats. 1996, ch. 498, § 2.3, p. 2954.) In 2001, the Legislature increased the section 52 minimum to $4,000, to increase deterrence against civil rights violations profitable to businesses but causing relatively

Nor is *Gunther* persuasive in its assertion that *Lentini*'s interpretation, under which ADA violations, even if not involving intentional discrimination, would be remediable by either section 52 or section 54.3 (*Lentini, supra,* 370 F.3d at pp. 846–847), "renders section 54.3 . . . redundant" (*Gunther, supra,* 144 Cal.App.4th at p. 241). The Unruh Civil Rights Act and the Disabled Persons Act clearly have significant areas of overlapping application, although the Unruh Civil Rights Act, of course, applies to many more types of discrimination, while the Disabled Persons Act contains unique specific provisions regarding guide, service, and signal dogs (§ 54.2) and may apply to more public places, facilities, and services than the Unruh Civil Rights Act. (Compare § 51, subd. (b) ["all business establishments of every kind whatsoever"] with § 54, subd. (a) ["streets, highways, sidewalks, walkways, public buildings . . . and other public places"] and § 54.1, subd. (a)(1) ["accommodations, advantages, facilities, . . . telephone facilities, . . . places to which the general public is invited"].) Recognizing the substantial overlap, the Legislature has expressly prohibited double recovery under sections 52 and 54.3. (§ 54.3, subd. (c).)[10] As to ADA violations, the overlap is plainly deliberate, the Legislature having specified that ADA violations are also violations of both the Unruh Civil Rights Act (§ 51, subd. (f)) and the Disabled Persons Act (§ 54.1, subd. (d)). This acknowledged overlap, therefore, does not require us to restrict, artificially and contrary to the statutory language, the types of ADA violations remediable under the Unruh Civil Rights Act.

---

little individual damage, such as gender discounts forbidden by section 51.6. (Stats. 2001, ch. 261, § 1; Sen. Com. on Judiciary, Analysis of Assem. Bill No. 587 (2001–2002 Reg. Sess.) as amended Mar. 26, 2001, pp. 6–7.) A bill to again equalize the two minimums by raising that in section 54.3 to $4,000 was passed by the Legislature in 2004, but vetoed by the Governor on the ground it would "have the effect of extorting money from state and local governments much the same way violations under the Unruh Act extort money from small businesses." (Governor's veto message to Assem. on Assem. Bill No. 1707 (Aug. 27, 2004) Recess J. No. 14 (2003–2004 Reg. Sess.) pp. 2954, 8125.) Absent from the history of either the 2001 legislation or the vetoed 2004 bill is any suggestion that the Unruh Civil Rights Act carries a higher minimum because it requires proof of intentional discrimination.

[10] Indeed, in 1996, when the Legislature added subdivision (c) to section 54.3, it also adjusted the Disabled Persons Act's minimum damages to equal those in the Unruh Civil Rights Act. (Stats. 1996, ch. 498, § 2.3, pp. 2954, 2955.) The legislative history indicates it did so largely *because* of the significant overlap between the two laws: "The concept that the penalties for violation of the specific disabled person access statutes should be the same as the remedies and penalties for violation of the Unruh Civil Rights Act's general prohibitions against discrimination seems sound. Since all acts that would violate the specific statutes, other than denial of access to assistance dog trainers[,] would also constitute violations of the general Unruh Civil Rights Act, it seems nonsensical to have the minimum penalty depend upon the statute that the aggrieved person happens to cite in his or her complaint." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1687 (1995–1996 Reg. Sess.) as amended Apr. 25, 1996, p. 3.)

*Gunther* also noted that under its interpretation of section 51, subdivision (f), violations of the ADA that do *not* involve intentional discrimination might still find a remedy in California law through an action charging an unlawful business practice (Bus. & Prof. Code, §§ 17200, 17203). (*Gunther, supra,* 144 Cal.App.4th at p. 234.) Though true, that could not have been a purpose of adding subdivision (f) to section 51. Violations of federal as well as state and local law may serve as the predicate for an unlawful practice claim under Business and Professions Code section 17200. (See *Quacchia v. DaimlerChrysler Corp.* (2004) 122 Cal.App.4th 1442, 1450, fn. 5 [19 Cal.Rptr.3d 508]; *Saunders v. Superior Court* (1994) 27 Cal.App.4th 832, 838–839 [33 Cal.Rptr.2d 438].) Assuming all other requirements for such an action were met, therefore, violations of the ADA's accessibility mandate, whether involving intentional discrimination or not, would be remediable through Business and Professions Code sections 17200 and 17203. It did not take incorporation of the ADA mandate into the Unruh Civil Rights Act to achieve that result.

## V. *Prevention of Abusive Litigation*

Finally, defendant argues that interpreting section 51, subdivision (f) and the Unruh Civil Rights Act as a whole to permit a damages remedy for ADA accessibility violations that do not involve intentional discrimination "would spur abuses in an already troubled legal arena." (See *Gunther, supra,* 144 Cal.App.4th at pp. 250–251 [reviewing federal court decisions noting a pattern of abusive litigation under the ADA and state law].) We recently addressed a similar argument that in order to suppress abusive litigation by serial plaintiffs or attorneys seeking only financial gain, often through extortion of settlements from small businesses, more should be required of Unruh Civil Rights Act plaintiffs. (*Angelucci v. Century Supper Club, supra,* 41 Cal.4th at p. 178.)[11] Observing that we "share[d] to some degree the[se] concerns," we nonetheless found they "do not supply a justification for our inserting additional elements of proof into the cause of action defined by the statute. It is for the Legislature (or the People through the initiative process) to determine whether to alter the statutory elements of proof to afford business establishments protection against abusive private legal actions and settlement tactics. It is for the Legislature, too, to consider whether limitations on the current statutory private cause of action might unduly weaken

---

[11] Though *Angelucci* arose in the context of gender discrimination, not denial of access to the disabled, we noted that much of the abusive litigation debate centered on ADA access suits. (*Angelucci v. Century Supper Club, supra,* 41 Cal.4th at p. 178, fn. 10.)

enforcement of the Act or place unwarranted barriers in the way of those persons who suffer discrimination and whose interests were intended to be served by the Act." (*Angelucci,* at p. 179.) Here, too, we are bound to interpret the Unruh Civil Rights Act in accordance with the legislative intent as we can best discern it, regardless of any policy views we may hold.

In its most recent regular session, moreover, the Legislature tackled the challenge of improving compliance with access laws while protecting businesses from abusive access litigation. In chapter 549 of the 2008 Statutes (Sen. Bill No. 1608 (2007–2008 Reg. Sess.)), the Legislature enacted several provisions with this purpose, including (1) a requirement that any attorney serving a complaint or sending a demand for money for a "construction-related accessibility claim"[12] must include a notice informing the recipient, among other things, that he or she is not required to pay any money until found liable by a court and may have a right to have the action stayed pending an early evaluation conference (§ 55.3); (2) procedures for voluntary inspection of a property by a "certified access specialist" or "CASp" (§ 55.53); (3) procedures for staying actions raising construction-related accessibility claims for 90 days (extendable to 180 days), if the property has been inspected by a CASp, for the plaintiff to provide details of his or her claims, damages, and attorney fees incurred, and for the court to hold an early evaluation conference during the stay period in order to evaluate the site's current condition and progress toward correcting any alleged violations, settlement possibilities, and sharing of further information between the parties (§ 55.54); and (4) provisions for the court to consider written settlement offers made and rejected when determining the amount of reasonable attorney fees on a construction-related accessibility claim (§ 55.55).

Most pertinent here, the new legislation (applicable to claims filed on or after Jan. 1, 2009) (§ 55.57) restricts the availability of statutory damages under sections 52 and 54.3, permitting their recovery only if an accessibility violation actually denied the plaintiff full and equal access, that is, only if "the plaintiff personally encountered the violation on a particular occasion, or

---

[12] A "construction-related accessibility claim" includes a public accommodation access claim brought under the Unruh Civil Rights Act or the Disabled Persons Act for violation of a "construction-related accessibility standard." (§ 55.52, subd. (a)(1).) The latter term refers to a state or federal standard or regulation for making facilities, whether existing or newly constructed, accessible to persons with disabilities and includes the ADA and the ADA accessibility guidelines. (§ 55.52, subd. (a)(6).)

the plaintiff was deterred from accessing a place of public accommodation on a particular occasion" (§ 55.56, subd. (b)). It also limits statutory damages to one assessment per occasion of access denial, rather than being based on the number of accessibility standards violated. (*Id.*, subd. (e).)

The 2008 Legislature was informed—and may be presumed to have been aware—that damages under the Unruh Civil Rights Act might be awarded for denial of ADA-mandated access without proof of intentional discrimination.[13] Yet, although two other bills introduced in the same session would have required accessibility plaintiffs to give businesses prelitigation notice of any violation and an opportunity to cure,[14] the reform approach the Legislature ultimately chose did *not* include requiring such notice or other proof of intent to discriminate. Instead, the Legislature chose to impose limitations on damages and attorney fees, coupled with a scheme of accessibility inspections, stays of litigation, and mandatory evaluation conferences. Even if we agreed with defendant that adding an intent requirement to the Unruh Civil Rights Act would be warranted to curb abuse, we would not be free to substitute our own judgment for that of the Legislature.

## CONCLUSION

■ For the above reasons, we answer the Ninth Circuit's first question (" 'Must a plaintiff who seeks damages under California Civil Code section 52, claiming the denial of full and equal treatment on the basis of disability in violation of the Unruh Civil Rights Act . . . and the [ADA], prove "intentional discrimination" '?") in the negative.

Insofar as they hold to the contrary, *Gunther v. Lin, supra*, 144 Cal.App.4th 223, and *Coronado v. Cobblestone Village Community Rentals, L.P.* (2008) 163 Cal.App.4th 831 [77 Cal.Rptr.3d 883] are disapproved.

---

[13] See Senate Committee on the Judiciary, Analysis of Senate Bill No. 1608 (2007–2008 Reg. Sess.) as amended April 21, 2008, page 7 (noting that in the context of an ADA violation, federal case law "provides that a plaintiff is not required to show intentional discrimination in order to recover under Unruh"); Assembly Committee on the Judiciary, Analysis of Senate Bill No. 1608 (2007–2008 Reg. Sess.) as amended May 27, 2008, page 4 (same).

Defendant argues that one part of the new law, by stating that the law does not require a property owner to hire a CASp and that the failure to do so may not be used to show "lack of intent to comply with the law" (§ 55.53, subd. (f)), implies that intent is required for statutory or compensatory damages under section 52, subdivision (a). But the legislative history quoted above rebuts any such inference. In any event, intent to comply with or violate the law might be relevant on a number of other issues, including the award of treble damages (§ 52, subd. (a)) or exemplary damages (*id.*, subd. (b)(1)) and the propriety of a civil enforcement action by the California Attorney General or district attorneys (*id.*, subd. (c)).

[14] Both bills, Assembly Bill No. 2533 (2007–2008 Reg. Sess.) and Senate Bill No. 1766 (2007–2008 Reg. Sess.), failed passage out of committee.

We do not answer the Ninth Circuit's second question (" 'If the answer to Question 1 is "yes," what does "intentional discrimination" mean in this context?' ") as it is premised on an affirmative answer to the first.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.