[No. A126524. First Dist., Div. Four. Jan. 11, 2011.]

In re the Marriage of CARI LYNN CADWELL-FASO and JOSEPH P. FASO.
CARI LYNN CADWELL-FASO, Appellant, v.
JOSEPH P. FASO, Respondent.

948

COUNSEL

Garrett C. Dailey for Appellant.

Law Offices of Bernard N. Wolf, Bernard N. Wolf; Law Offices of Hakeem, Ellis & Marengo and Albert M. Ellis for Respondent.

OPINION

**REARDON, J.**—Family Code[1] section 1615, subdivision (c) (section 1615(c)), as amended effective January 1, 2002, creates a presumption "that a premarital agreement was not executed voluntarily" unless the court makes five designated findings. (See Stats. 2001, ch. 286, § 2, p. 2317; *In re Marriage of Friedman* (2002) 100 Cal.App.4th 65, 72 [122 Cal.Rptr.2d 412].) These include the finding that the party against whom enforcement is sought had at least seven calendar days between the date he or she was "first presented" with the agreement and advised to seek independent counsel, and the time he or she signed the agreement. (§ 1615(c)(2).) The trial court ruled that because seven days did not elapse between the time respondent Joseph P. Faso (Faso) was presented with the final draft addenda (the Addendum) to the premarital agreement and the time he signed it, his execution was deemed involuntary

---

[1] Unless otherwise noted, all statutory references are to the Family Code. Section 1615, subdivision (a) provides in part: "A premarital agreement is not enforceable if the party against whom enforcement is sought proves either of the following: [¶] (1) That party did not execute the agreement voluntarily. [¶] (2) The agreement was unconscionable when it was executed . . . ." Subdivision (c) states: "For the purposes of subdivision (a), it shall be deemed that a premarital agreement was not executed voluntarily unless the court finds in writing or on the record all of the following: [¶] (1) The party against whom enforcement is sought was represented by independent legal counsel at the time of signing the agreement or, after being advised to seek independent legal counsel, expressly waived, in a separate writing, representation by independent legal counsel. [¶] (2) The party against whom enforcement is sought had not less than seven calendar days between the time that party was first presented with the agreement and advised to seek independent legal counsel and the time the agreement was signed. [¶] (3) The party against whom enforcement is sought, if unrepresented by legal counsel, was fully informed of the terms and basic effect of the agreement as well as the rights and obligations he or she was giving up by signing the agreement, and was proficient in the language in which the explanation of the party's rights was conducted and in which the agreement was written. The explanation of the rights and obligations relinquished shall be memorialized in writing and delivered to the party prior to signing the agreement. The unrepresented party shall, on or before the signing of the premarital agreement, execute a document declaring that he or she received the information required by this paragraph and indicating who provided that information. [¶] (4) The agreement and the writings executed pursuant to paragraphs (1) and (3) were not executed under duress, fraud, or undue influence, and the parties did not lack capacity to enter into the agreement. [¶] (5) Any other factors the court deems relevant." (§ 1615, subd. (c).)

and the Addendum was unenforceable. Appellant Cari Lynn Cadwell-Faso (Cadwell-Faso) urges that where, as here, multiple drafts of a document are exchanged, the Legislature did not intend to erect an absolute seven-day waiting period between presentation of the last draft, and its execution. Alternatively, she charges that Faso should be estopped from relying on the seven-day rule.

We conclude, after receiving supplemental briefing and applying the rules of statutory interpretation, that section 1615(c)(2) simply does not pertain in the current situation where the party against whom enforcement is sought was represented by counsel from the outset of the transaction. Accordingly, we reverse the judgment.

## I. FACTUAL BACKGROUND

### A. *The Parties*

Faso and Cadwell-Faso met in 2003 or 2004. He was 21 years her senior. Cadwell-Faso owned and operated her own business in Alameda. Faso was a wealthy, retired businessperson residing in Stockton.

The parties married on May 27, 2006, and separated less than 18 months later, on November 2, 2007.

### B. *The Premarital Agreement and Addenda*

Prior to their marriage, the couple discussed having a premarital agreement; both parties wanted such an agreement. In December 2005, Faso's attorney, James Dyke, drafted a premarital agreement. Faso presented it to Cadwell-Faso and advised her to seek independent counsel. Cadwell-Faso hired Attorney Dan Godeke. She was not satisfied with the agreement and asked Godeke to prepare an addendum. Between March and May 2006, Godeke drafted five addenda. Faso did not agree to the terms of the first four drafts.[2]

---

[2] The first draft provided that Faso would pay off the mortgage on Cadwell-Faso's Sea Ranch property within one year; she would become an equitable owner of his Florida residential property; if they were still married at Faso's death, Cadwell-Faso would receive specified income from his estate; and if they divorced, she would have the right to claim spousal support. The second version added that Cadwell-Faso would sell her business and move to Stockton and that her retirement accounts would remain her separate property. Draft number three stated Faso would pay off the Sea Ranch mortgage within two years; provided for Cadwell-Faso's equitable ownership in properties in Mexico, Costa Rica and Fort Worth, Texas, but not Florida; called for provisions of health care for Cadwell-Faso for life; inserted specific spousal support provisions in her favor should they divorce; and eliminated any income stream to Cadwell-Faso upon Faso's death during the marriage. The fourth draft

On May 17, 2006, Cadwell-Faso faxed Faso a "goodbye" letter along with the four unsigned draft addenda, saying she loved him but was calling off the wedding in light of their inability to reach an agreement. Thereafter the parties spoke by phone. Faso said, "Let's get married, let's get this thing done." At that time they discussed their disagreements, and, on the basis of those discussions, Cadwell-Faso directed Godeke to prepare a fifth draft addenda.

On May 18, 2006, Godeke faxed his client the fifth draft, which draft became the Addendum; on May 19 she faxed it to Faso, and he had it forwarded to his attorney on May 22. The parties met in Dyke's office on May 25, 2006. Dyke inserted the word "reasonable" in front of the phrase "actual health care needs" of Cadwell-Faso, which the Addendum obligated Faso to pay during her lifetime. With that, the parties executed the premarital agreement and the Addendum. They married two days later.

The premarital agreement recited the parties' intention to waive California community property laws. Therein Cadwell-Faso estimated that the net fair market value of her estate exceeded $1 million without taking into account the liabilities detailed on an attached exhibit.[3] Faso estimated that the net fair market value of his estate exceeded $30 million. In the event the marriage terminated, the parties generally agreed to waive community property and spousal support claims against each other.

The Addendum begins with these recitals: "During her adult life until now, CARI has attended to her own financial affairs. She owns and operates her own business, she owns a residence with a mortgage of meaningful proportions, and she has made investments toward a retirement which she has anticipated would be a quarter century away. [¶] An aspect of the plan for this marriage is that CARI will dispose of her business, and, substantially, withdraw from her life of independent earning and support, at age 43 years. She will move to Stockton with JOE, they expect to travel widely, and generally they expect to lead lives associated with at least semi-retirement. [¶] CARI is not in a financial position to retire, nor will she become so, independent of JOE, in the life style anticipated for this marriage. JOE has acquired and developed a very substantial asset base during his working life."

Substantively, the Addendum provided that within 10 years following the marriage, Faso would pay off the mortgage of approximately $400,000 on

---

extended to 10 years the time to pay off the Sea Ranch mortgage and changed provisions regarding Cadwell-Faso's rights in Faso's real property.

[3] This exhibit does not appear in the record.

Cadwell-Faso's Sea Ranch property, an obligation that was binding even if the marriage terminated. As well, the Addendum restricted Faso's ability to alienate certain real property holdings, and gave Cadwell-Faso certain rights in those holdings should he sell them during the marriage, or predecease her while still married. Further, Faso undertook to provide for Cadwell-Faso's reasonable health care needs, for life, even if the marriage terminated or he predeceased her. In the event of a dissolution, Faso agreed to pay Cadwell-Faso spousal support in the amount of $1,000 per month for each year of the marriage, up to a maximum of $5,000 per month, for a period equal to one-half the length of the marriage.

## C. *Legal Proceedings*

Cadwell-Faso petitioned for legal separation on November 13, 2007. The next month Faso sought dissolution of marriage. Thereafter Cadwell-Faso moved for temporary spousal support and attorney fees. Among other responses, Faso moved to set aside the Addendum, arguing that the document was invalid because he did not have seven days between the time of presentation and execution, as required by section 1615(c)(2). The matter proceeded to trial in two phases, the first phase concerning enforceability of the premarital agreement and the Addendum, the second addressing the matter of spousal support.

### 1. *Phase One*

a. *Hearing.* Cadwell-Faso testified that she had no knowledge or communication with Joe "about the validity of the agreement based on when it was being signed." The issue "never came up." She believed that as long as "it was signed . . . prior to the time" they exchanged vows, "that was appropriate." Cadwell-Faso did, however, concede that the terms varied in each draft addendum.

Additionally, Cadwell-Faso stated that prior to the marriage, she earned between $10,000 and $20,000 per month and lived a very comfortable life. Although the tax returns presented at trial reflected that the business "actually had a loss," she explained: "[W]hen you're a sole proprietorship, you run everything through your business. So what you make comes in—you basically live through the business." As well, Cadwell-Faso was adamant that she kept her part of the bargain: She moved to Stockton and sold her ad specialty business.

Cadwell-Faso acknowledged that Faso provided funds for her to purchase a second Sea Ranch property. Moreover, since their separation Faso continued to make the $2,700 monthly mortgage payments on her first Sea Ranch property, which she rented for around $1,800 a month. According to Faso, he also gave her an American Express credit card, paid the charges on it, and bought her a car.

Faso also testified that he did not want to sign the Addendum, but did so because Cadwell-Faso indicated "her attorney said that we had already passed the time of limitation between when you agree upon the agreement and when you sign the agreement and when you get married." His own attorney confirmed that notion. When the parties were in Dyke's office, he told them both that the Addendum was not a binding agreement "and the only way that it's going to be is if you come back and sign a post-nuptial."

b. *Ruling*. On the matter of enforceability, the trial court made the following findings and rulings: "On May 25th H was advised by his attorney prior to signing that, as the final draft of the Addenda had [not] been presented within seven days of the day that they were signing, the Addenda was unenforceable. They did not advise W of this or discuss the possibility of waiting one more day so as to obviate that problem. In reliance on his attorney's opinion regarding the agreement's unenforceability, H signed the agreement. W, on the other hand, signed the agreement on the 25th because she believed that she and H had in fact reached an agreement."

As well, the court found there was "strong evidence that H, a sophisticated business executive, was . . . playing 'hardball.' He was refusing to negotiate with W and, at the very end when she threatened to call the wedding off, he agreed to sign only because the matter had come to a head within the seven day window and he had legal advice that he could sign with impunity. Rather than being a 'victim' of circumstances, H shrewdly maneuvered W to the alter [*sic*] in a manner that frustrated her desire to reach a mutually acceptable agreement."

Notwithstanding this behavior, the court concluded that the seven-day rule applied. First, contrary to Cadwell-Faso's position, the statute applied to both represented and unrepresented parties. The court reasoned that the statutory language "does not say that" it pertained only to unrepresented parties, and the drafters "clearly [know] how to insert such a limitation when it was intended," citing the language of section 1615(c)(3). Further, although the seven-day rule arguably was intended to allow the unrepresented party time to seek out counsel and made little sense when counsel was already on board,

the court concluded it was "equally plausible that the Legislature intended to allow even represented parties time to consult with counsel and avoid a last minute rush that might leave one party with insufficient time to consult and consider complicated revisions."

Second, the seven-day clock did not begin to run from the presentation of the first draft of the addenda. The court said: "The first draft presented may have no relationship to the draft that is eventually signed, and it [is] unlikely that the legislative purpose was simply to ensure that there was an advisement at the outset. The initial draft, [after all], might be quite innocuous, and then months later on the eve of the wedding, complicated and burdensome terms might be inserted. To construe the requirement of this subsection as only attaching to the initial draft without consideration of the abuses such a construction might enable would do violence to the clear legislative intent."

The court held that the seven-day rule was mandatory, and the statute as drafted did not limit the rule to the unrepresented. Because presentation of the Addendum ran afoul of the seven-day rule in this case, Faso's execution of the document was deemed involuntary and the Addendum was unenforceable.

As to the matter of estoppel, the court explained that because the Legislature mandated a seven-day waiting period, promissory estoppel principles could not be used to enforce an agreement executed prior to the close of that period. Nonetheless, the court conveyed that in weighing the statutory factors affecting the issue of spousal support, Cadwell-Faso's reliance on the premarital agreement to press forward with marriage and sell her business, coupled with Faso's conscious decision to sign the agreement in reliance on its unenforceability, were factors it could consider under the section 4320, subdivision (n) catchall, "[a]ny other factors the court determines are just and equitable."

### 2. *Phase Two*

a. *Hearing.* At the outset Faso abandoned his claim for reimbursement of funds paid to Cadwell-Faso and her business, as well as the approximately $140,000 down payment on a second Sea Ranch property.

Cadwell-Faso testified that prior to 2003 when she became involved with Faso, her business generated between $10,000 and $20,000 per month.

However, revenue declined when she began travelling with Faso and did not work as much. Her accountant represented that the business sold in 2007 for $450,000.[4] He opined the business was worth $593,000 at that time, although he admitted that it sustained net losses of $16,754 and $24,479 in 2006 and 2005 respectively.

Faso's accountant declared that the purchase price "appears to be several multiples above and beyond what the owner's discretionary cash flow was prior to the sale" and "would far [exceed] the indicated value of the business based on the earnings reported on the tax returns." For each of the years 2004 through 2006, the business reported net annual losses. Just looking at the gross profit (sales minus cost of sales), he did not see how Cadwell-Faso could pull $10,000 per month for living expenses.

Faso calculated that during the marriage, gifts of funds to Cadwell-Faso totaled $496,000.

b. *Decision.* The trial court denied permanent spousal support to Cadwell-Faso, concluding there was no basis to award spousal support on a restitutionary theory by restoring her to the economic position she enjoyed prior to selling the business. The best evidence of the value of the business was its sale price of $450,000. Cadwell-Faso had repossessed the business and was working to restore it in the present economic climate. The court found it impossible to ascertain how the business would have fared had she continued to operate it through the economic downturn. Additionally, given that Faso made significant financial contributions to Cadwell-Faso during the marriage and paid spousal support through the date of trial, the court decided he had "paid enough" by way of spousal support in the short-term marriage. Finally, the court awarded Cadwell-Faso $45,000 in attorney fees.

## II. THE ADDENDUM IS ENFORCEABLE UNDER SECTION 1615

### A. *Legal Background; Governing Principles*

Prior to 2001, section 1615 provided that a premarital agreement is not enforceable if the party against whom enforcement is pressed proves that (1) he or she did not execute the agreement voluntarily, or (2) the agreement was unconscionable when entered into *and* the party did not have actual or constructive knowledge of the other party's assets and obligations, and did not waive disclosure of such assets and obligations. (Former § 1615, subd. (a); Stats. 1992, ch. 162, § 10, p. 500.)

---

[4] Cadwell-Faso stated she only received $250,000 before the buyer defaulted, but received some commissions through 2009 because she continued to work for the company part time.

In 2000, our Supreme Court decided *In re Marriage of Bonds* (2000) 24 Cal.4th 1 [99 Cal.Rptr.2d 252, 5 P.3d 815] (*Bonds*). There, the fiancée of Barry Bonds, whose native languish was Swedish, received a premarital agreement prepared by Bonds's attorney on the eve of their wedding. The fiancée signed the agreement without the benefit of independent counsel and was subsequently held to it in litigation. The issue was whether she entered the agreement voluntarily. The trial court said she did, and the Supreme Court determined that finding was supported by substantial evidence, reversing the Court of Appeal holding that premarital agreements are subject to strict scrutiny where the less sophisticated party does not have independent counsel. (*Id.* at pp. 6, 37–38.) Rather, the circumstance that one of the parties was not represented by independent counsel is but one of several factors that courts must consider in deciding whether a premarital agreement was entered into voluntarily. (*Id.* at p. 6.) The statute in effect at the time did not define the term "voluntarily" and placed the burden on the party seeking to block enforcement to prove that he or she did not execute the agreement voluntarily. (*Id.* at pp. 15, 24.)

█ The Legislature responded swiftly with amendments to section 1615. (Stats. 2001, ch. 286, § 2, p. 2317.) Among other matters, the amendments added subdivision (c), which codifies the set of circumstances which, together, will defeat the default presumption that a premarital agreement was not executed voluntarily. Although under section 1615, subdivision (a), the party challenging enforceability of a premarital agreement bears the burden of proving involuntary execution or unconscionability, subdivision (c) lightens that burden when the contest centers on the issue of voluntary execution. The law now *deems* that a premarital agreement is not voluntarily executed unless the court makes *all* of the five designated findings. With the five findings, the presumption of involuntary execution is overcome as a matter of law. As explained in a family law treatise, the statute "places an evidentiary burden upon the party *seeking to enforce* a premarital agreement: He or she must be prepared to present evidence sufficient for the court to make the Fam.C. § 1615(c)(1) through (5) findings; otherwise, the premarital agreement *must* be held unenforceable as having been *involuntarily* executed." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2010) ¶ 9:152.1, p. 9-41 (rev. # 1, 2007).)

On appeal the parties have focused on whether the seven-day period is mandatory and absolute, and the companion question of when the seven-day period commences. However, we are concerned with the threshold matter addressed below, namely does section 1615(c)(2) apply to parties such as Faso who, from the outset, are represented in the transaction by independent counsel, or does it apply only to unrepresented parties? Having requested and

received supplemental letter briefing on this issue, we conclude subdivision (c)(2) does not apply in the present situation. The question, of course, is one of statutory interpretation.

■ The rules governing statutory interpretation are clear. Our fundamental job is to ascertain the intent of the lawmakers in order to effect the statute's purpose. (Code Civ. Proc., § 1859; *Munson v. Del Taco, Inc.* (2009) 46 Cal.4th 661, 666 [94 Cal.Rptr.3d 685, 208 P.3d 623].) We look first to the actual language of the statute. "If the terms are unambiguous, we conclude the lawmakers meant what they said and the plain meaning of the language prevails." (*San Mateo County Dept. of Child Support Services v. Clark* (2008) 168 Cal.App.4th 834, 841 [85 Cal.Rptr.3d 763].) As well, we must give effect to statutes according to the usual, ordinary import of the language used in framing them, and construe words and phrases in context, keeping in mind the nature and obvious purposes of the statute. (Civ. Code, § 13; *Phelps v. Stostad* (1997) 16 Cal.4th 23, 32 [65 Cal.Rptr.2d 360, 939 P.2d 760].) And, if possible, we give meaning to every word of a statute, thus avoiding rendering any word surplusage. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1118 [81 Cal.Rptr.2d 471, 969 P.2d 564].) And finally, we garner legislative intent from the statute as a whole rather than from isolated phrases or words. (*Id.* at pp. 1118–1119.)

■ On the other hand, if the meaning of the statutory language is not clear, we may enlist extrinsic aids, including the legislative history of the statute, to divine the legislative intent. But if neither the words of the statute nor its history expose a clear meaning, "we apply reason and practicality, and interpret the statute in accord with common sense and justice, and to avoid an absurd result." (*In re Marriage of Campbell* (2006) 136 Cal.App.4th 502, 506 [38 Cal.Rptr.3d 908].) Thus we will not sacrifice the legislative purpose to a literal construction of a statute. (*Slatkin v. White* (2002) 102 Cal.App.4th 963, 970 [126 Cal.Rptr.2d 54].)

B. *Legislative History*

Section 1615(c)(2) is ambiguous. We cannot ascertain from its face whether the seven-day rule is confined to unrepresented parties, or whether it also covers those represented from the outset by independent counsel. Although the statute does not specify that it only applies to unrepresented parties, an ambiguity arises from the conjunctive phrase stating there must be at least seven days between the time the party "was first presented with the agreement *and* advised to seek independent legal counsel . . . ." (§ 1615(c), italics added.)

While the legislative history does not entirely resolve the ambiguity, it does make it abundantly clear that the Legislature was concerned about the presumed voluntariness of premarital agreements in situations such as *Bonds*, where one party is not represented by independent counsel. The *Bonds* decision was handed down on August 21, 2000. Less than five months later, on January 11, 2001, Senator Sheila Kuehl introduced Senate Bill No. 78 (2001–2002 Reg. Sess.). The initial Senate Judiciary Committee analysis of the bill specifically referenced the *Bonds* decision and a companion case, indicating that the proposed legislation was "in specific response" to those cases. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 78 (2001–2002 Reg. Sess.) Apr. 24, 2001, p. 3 (hereafter Senate Bill Analysis).) Highlighting *Bonds*, the analysis focused on the Supreme Court's holding "that a party's lack of representation by independent counsel in the executing of a premarital agreement was only one factor to consider in determining whether the agreement was entered into voluntarily, as opposed to being unenforceable under California's version of the [Uniform Premarital Agreement Act (UPAA)]." (Senate Bill Analysis, *supra*, at p. 2.)

Further, the analysis described the proposed changes to existing law as follows: "This bill would provide that a court shall find that a premarital agreement was *not* executed voluntarily unless the court finds that the party against whom enforcement is sought (1) either was represented by counsel when the agreement was signed, or waived representation in writing; (2) had at least seven days between the presentation and the signing of the agreement to seek legal advice; (3) if not represented by counsel, was fully informed as to the terms and effect of the agreement, was proficient in the language used in the explanation and the agreement, and signed a statement confirming receipt of the information before signing the agreement; *and* (4) neither lacked the capacity to enter the agreement nor did so under duress, fraud, or undue influence." (Senate Bill Analysis, at p. 4, italics added.) Later, in the comment section entitled "Requiring legal counsel or written waivers for voluntary agreements," the analysis stated: "In the Bonds case, after holding that lack of legal representation was only one factor to be considered in determining whether execution of a premarital agreement was voluntary, the Supreme Court nevertheless observed that, 'obviously, the best assurance of enforceability is independent representation for both parties.' [Citation.] [¶] The author agrees. This bill would amend the enforceability provision of the UPAA to require, for a finding of voluntariness, that the party against whom enforcement was sought either was represented by counsel at the signing of the agreement or waived representation in writing, was proficient in the language used, had adequate time to seek and be advised by counsel, and if counsel was waived, was fully informed about the nature and effects of the agreement and signed a statement to that effect before executing the agreement." (Senate Bill Analysis, *supra*, at p. 7.)

The description of proposed changes, quoted above, might suggest that the seven-day waiting period was intended to apply to any party, i.e., that even a represented party would have seven days to seek out legal advice. As Faso points out, in *Bonds* the Supreme Court mentioned that the cases cited in a comment to the UPAA's enforcement provision directed attention to the impact of various factors on the parties, including "the presence or absence of independent counsel *or* of an opportunity to consult independent counsel . . . ." (*Bonds, supra*, 24 Cal.4th at p. 18, italics added.)

Conversely, the specific comment on requiring legal counsel or waivers seems to suggest an either/or situation—either the party must be represented by counsel or waives representation, with the various requirements, *including the seven-day waiting period*, intended to assure that the unrepresented party understood what she or he was entering into.

Subsequent bill analyses and reports by various legislative committees tracked the actual language of section 1615(c),[5] and some also emphasized in the synopsis the particular enumerated condition requiring representation by independent counsel, or an express waiver.[6]

C. *Analysis*

 Scrutinizing the statute as a whole as we must, we are mindful that section 1615(c)(1) and (3) both make distinctions between represented and unrepresented parties, thus demonstrating that the drafters knew how to place limitations on the party against whom enforcement was sought. Specifically, subdivision (c)(1) distinguishes between a party represented by independent legal counsel and a party who, after being advised to seek counsel, waives representation; subdivision (c)(3) concerns solely unrepresented parties. On the other hand, subdivision(c)(2) contains no such explicit limitations or distinctions. However, we cannot avoid the glaring fact that the seven-day waiting period is measured from the time the party against whom enforcement is sought "was first presented with the agreement *and advised to seek independent legal counsel*," and the moment of execution. (§ 1615(c)(2), italics added.) The conjunctive phrase, requiring both presentment and advice,

---

[5] See, for example, Senate Rules Committee, Office of Senate Floor Analyses, 3d reading analysis of Senate Bill No. 78 (2001–2002 Reg. Sess.) as amended May 1, 2001, pages 2–3; Assembly Committee on Judiciary, Analysis of Senate Bill No. 78 (2001–2002 Reg. Sess.) as amended June 21, 2001, page 3; Assembly Committee on Judiciary, Analysis of Senate Bill No. 78 (2001–2002 Reg. Sess.) as amended June 21, 2001, pages 2–3.

[6] See, for example, Assembly Committee on Judiciary, Analysis of Senate Bill No. 78 (2001–2002 Reg. Sess.) as amended June 21, 2001, page 2; Assembly Committee on Judiciary, Analysis of Senate Bill No. 78 (2001–2002 Reg. Sess.) as amended June 21, 2001, page 1.

implies that the waiting period is for the benefit of a party not represented by counsel at the time the agreement is presented, thereby affording time to obtain counsel and enjoy the benefit of counsel's review of the agreement and advice prior to signing it. We also point out that this requirement follows directly from the subdivision (c)(1) language specifying that the party to be held to the agreement is either independently represented by counsel or expressly waives counsel in writing *"after being advised to seek independent legal counsel . . . ."* (§ 1615(c)(1), italics added.) In other words, the flow and sense of the statute is that section 1615(c)(2) is a continuation of the requirements pertaining to an unrepresented party.

From a practical and commonsense perspective, it would be absurd to require a party pursuing enforcement to advise the other party to seek independent legal counsel when that party is *already* represented in the transaction by independent counsel. In other words, were we to interpret section 1615(c)(2) as applying to represented parties, the advisement requirement becomes meaningless surplusage. Yet, when applied to an unrepresented party, the advisement proviso is critical.

Moreover, the seven-day period makes sense as a necessary condition to finding voluntary execution on the part of an unrepresented party because the requirement affords a reasonable period of time to obtain and consult with independent counsel prior to signing a premarital agreement. On the other hand, when a party is already represented by counsel *in the transaction*, obtaining the requisite advice can occur very quickly and no purpose is served by imposing a statutory waiting period. Retained counsel can control the timeline. If not available straight away to review a document, any competent attorney would advise the client not to sign it until the attorney reviewed the document and consulted with the client. Whether this occurred within the seven-day period or beyond it, the client is protected. The same cannot be said for the unrepresented party.

Further, as we have shown, the legislative history reveals that the Legislature was concerned with protecting unrepresented parties. The seven-day rule allows time for the unrepresented party to locate and consult with independent counsel, or time to consider the agreement after receiving it.

Faso cautions that interpreting section 1615(c)(2) as limited to unrepresented parties would produce absurd results. His reasoning does not persuade us.

■ First, citing *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 [79 Cal.Rptr.3d 588], he claims this interpretation would favor unrepresented parties over parties represented by counsel. Faso reasons that if section 1615(c)(2) applied only to unrepresented parties, this means the statute would *grant* a seven-day waiting period to self-represented parties in all circumstances, but *deny* the same period to represented parties under all circumstances, in direct contravention of the rule of *Falcone & Fyke* that self-represented parties are entitled to no greater consideration than other litigants. This is a rule governing *how courts treat* parties once they are involved in litigation at the trial or appellate level. Section 1615(c) is *a legislative enactment* addressing the unique law and policy issues that bear on the enforceability of an agreement between prospective spouses. The Legislature, as a separate branch of government, is free to impose standards and protections in the premarital context, including protections for unrepresented parties. It can, for example, take into account and address the realities of entering a premarital agreement, including the potential for coercion, the possible long-lasting negative impacts of unequal bargaining power or lack of full knowledge of one's rights, and the like.

■ Next, Faso maintains that limiting the applicability of section 1615(c)(2) to unrepresented parties could deny a party who obtains counsel the effective representation of such counsel if the party is presented with a premarital agreement with insufficient time to consult his or her lawyer and consider complicated provisions or revisions. We are not sure what Faso means. Certainly nothing in section 1615(c)(2) *prevents* a party from taking as much time as needed, beyond seven days from presentment, to consult with counsel, mull over troubling provisions, etc., prior to signing the agreement.

Finally, Faso posits that confining section 1615(c)(2) to unrepresented parties would render the statute ambiguous in the following situation: An unrepresented party signs the agreement *before* the seven-day period elapses, and then obtains counsel three days later, still *within* the seven-day period. Under this hypothetical, because the seven-day period had not elapsed, the premarital agreement would be unenforceable. But, Faso argues, if the sole purpose of the statute is to allow the unrepresented party seven days to obtain counsel, that purpose would have been served and the parties' consent to the agreement would be deemed voluntary. But of course the sole purpose is not simply to allow the unrepresented party seven days to obtain counsel; the purpose is to allow seven days to seek and obtain legal advice *prior to* execution.

### III. CONCLUSION AND DISPOSITION

For all these reasons, we conclude that section 1615(c)(2) does not pertain to Faso, a party who was represented in the transaction from the outset. Hence the trial court erred in deeming that his execution of the Addendum was involuntary and therefore unenforceable. The Addendum is enforceable.

The judgment is reversed. Costs are awarded to Cadwell-Faso on appeal.

Ruvolo, P. J., and Sepulveda, J., concurred.

A petition for a rehearing was denied January 27, 2011, and respondent's petition for review by the Supreme Court was denied March 23, 2011, S190706.