Filed 7/1/25  Marriage of Toossi and McKinnies CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of NAHID TOOSSI and WILLIAM McKINNIES. | |
| NAHID TOOSSI,<br><br>    Respondent,<br><br>        v.<br><br>WILLIAM McKINNIES,<br><br>    Appellant. | G063735<br><br>(Super. Ct. No. 21D003571)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Sherri L. Honer, Judge. Affirmed.

Law Offices of Lisa R. McCall, Lisa R. McCall and Erica M. Barbero for Appellant.

Quinn & Dworakowski and David Dworakowski for Respondent.

After conducting a bifurcated proceeding to determine whether appellant William McKinnies (Husband) voluntarily entered into a premarital agreement with respondent Nahid Toossi (Wife), the family court found he did. The court's order addressed each of the findings required by Family Code section 1615, subdivision (c).[1] Husband contends the court erroneously found his attorney was independent and he was not entitled to a seven-day waiting period between the day he was first presented with the final agreement and the date he signed it. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I.

FACTS SURROUNDING EXECUTION OF THE AGREEMENT AND

THE PARTIES' MARRIAGE[2]

The parties were engaged in 2015. Both of them had previously been married and had adult children. While they were dating, they discussed creating a premarital agreement but never got around to preparing one.[3] But on January 22, 2016, the day before they were planning to marry, Wife told Husband she wanted to postpone the wedding due to the absence of a premarital agreement. Although Husband was initially upset about the

---

[1] All further statutory references are to the Family Code.

[2] We have summarized the evidence in the light most favorable to Wife, the prevailing party. (*In re Marriage of Rothrock* (2008) 159 Cal.App.4th 223, 230.)

[3] "A 'premarital' (or 'antenuptial') agreement is a contract executed between prospective spouses in contemplation of marriage, fixing marital property rights and financial responsibilities upon consummation of the marriage." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2025) ¶ 9:140, p. 9–66.)

postponement of the wedding, he told Wife he still wanted to marry her. Wife agreed to reschedule the wedding, provided there was a premarital agreement in place.

Husband downloaded a template for a premarital agreement from the internet and came up with a proposed formula for dividing the residential property they were in the process of purchasing. The parties prepared a five-page draft of an agreement they wanted to implement into a formal agreement. By that time, *both* parties wanted a premarital agreement.

Wife retained an attorney, Roya Rohani, on or about January 26, 2016, to prepare a formal premarital agreement for the parties' signature. On January 27, 2016, Husband and Wife met in person with Rohani for approximately three hours at Rohani's office. Before the parties arrived at her office, Rohani had already prepared a draft agreement based on her communication with Wife, but it did not address the division of the home they were in the process of buying. The parties brought their draft five-page agreement with them to give Rohani, as well as the template Husband had downloaded from the internet and the formula he had devised for dividing the home they were planning to purchase. Rohani reviewed the template and Husband's notes, then asked him to explain the formula he wanted to include in the final agreement. Husband explained he developed the formula so that the longer the marriage lasted, the greater the community property share in the home.

During the meeting, the parties gave Rohani financial documents, including bank statements, investment accounts, mortgage statements, and trust documents, which were laid out on the table for review.

3

Rohani believed Husband was very knowledgeable about how community property works.

During the meeting, Rohani made changes to the draft of the premarital agreement she had prepared before the meeting and finalized it during the meeting based on the further input and documentation she had received from Husband and Wife. Before Husband and Wife left the meeting, Rohani gave them hardcopies of what she believed would be the final version of the premarital agreement. Rohani made no attempt to have Husband waive his right to independent counsel. To the contrary, Rohani repeatedly advised Husband during the meeting he needed to obtain independent counsel to review the proposed agreement. A written advisement to seek independent counsel also was prominently placed at the top of the proposed agreement Rohani gave to Husband.

Rohani's office was in a building with many other lawyers and law firms. Rohani told Husband if he wanted to, he could select one of the other attorneys in the building to represent him with respect to his review and execution of the premarital agreement, but Rohani did not recommend any specific attorney. On his way out of Rohani's office on January 27, Husband picked up several attorney business cards from the common reception area, and while discussing the matter with Wife as they drove away from the office, he told Wife he would retain attorney Kathleen Wallace. By the next morning, Wife had notified Rohani of Husband's decision to retain Wallace.

On January 28, 2016, Rohani spoke with Wallace about Husband retaining Wallace to review and advise him on the proposed premarital agreement.

The following day, Rohani e-mailed Wife the proposed final version of the premarital agreement she previously had provided to Husband and Wife on January 27. Rohani copied Wallace on the e-mail. Rohani's e-mail stated if Husband and Wallace needed more time, they could postpone the execution of the premarital agreement to give them both time to contemplate the matter, ask for further explanation, and make an informed decision.

Wife e-mailed Rohani, Wallace, and Husband on January 31, 2016, requesting some non-substantive changes to the agreement. Wife also attached her revised financial disclosure. In her e-mail, Wife stated: "ps I have cc'd [Husband] here as well, after we independ[e]ntly reviewed the agreement the list above represents our cummalitive [sic] input." The e-mail also confirmed a meeting at Rohani's office on February 2, at 10:30 a.m.

Rohani made the requested revisions to the agreement, and on January 31, she e-mailed the further revised version of it (which ultimately became the final, signed, agreement) to Wallace and both parties, asking them to review it before the scheduled February 2 meeting.

On February 2, the parties met at Rohani's office for the purpose of executing the agreement. Wallace was present and had reviewed the document prior to the parties' arrival. This was the first time Wallace had met or spoken to Husband, but she understood she was his attorney and, as such, it was her duty to explain the terms of the agreement to him, which she did—page by page, and clause by clause. Wallace understood if Husband had any concerns with the agreement, it was her role to try to renegotiate it on his behalf. Wallace and Husband spoke privately in a room separate from Wife and Rohani for approximately one hour. During that time, Husband asked Wallace questions, and she answered them. Wallace understood she

5

represented only Husband. When she explained the terms of the agreement to him, Husband indicated he understood. The parties executed the agreement that day. Husband initialed every page of the agreement—indicating he understood the terms set forth in it. Wallace controlled the timing of the execution of the agreement. Husband paid Wallace for her services.

Husband and Wife were married on February 28, 2016. They separated five years later in 2021.

## II.

### RELEVANT PROCEDURAL HISTORY

In the proceeding below, Wife sought to enforce the final, signed, agreement (the Agreement). At Husband's request, the family court bifurcated the issue of the validity of the Agreement, and the hearing took place over three days in August 2023. On October 6, 2023, the family court issued its statement of decision. On January 10, 2024, the court issued its findings and order after hearing. The family court certified the issue of the validity and enforceability of the Agreement for immediate appeal. We granted Husband's motion to appeal the order pursuant to California Rules of Court, rule 5.392(d).

## DISCUSSION

### I.

### APPLICABLE LAW

Section 1615 governs enforcement of premarital agreements. Generally, "[t]he version of the statute in force at the time the parties executed [a premarital agreement] governs." (*Knapp v. Ginsberg* (2021) 67

Cal.App.5th 504, 526, fn. 6.) Here, the version of section 1615 in effect when the parties executed the Agreement was effective January 1, 2002.[4]

Section 1615, subdivision (c) creates a presumption "that a premarital agreement is *unenforceable* on the ground it was not executed voluntarily" (*Last v. Superior Court* (2023) 94 Cal.App.5th 30, 39) unless the trial court makes five specified findings. (§ 1615, subd. (c)(1)–(5).) The findings are: "(1) The party against whom enforcement is sought was represented by independent legal counsel at the time of signing the agreement or, after being advised to seek independent legal counsel, expressly waived, in a separate writing, representation by independent legal counsel. . . .  [¶] (2) One of the following: [¶] (A)  . . . [T]he party against whom enforcement is sought had not less than seven calendar days between the time that party was first presented with the final agreement and advised to seek independent legal counsel and the time the agreement was signed. . . . [¶] . . . [¶] (3) The party against whom enforcement is sought, if unrepresented by legal counsel, was fully informed of the terms and basic effect of the agreement as well as the rights and obligations the party was giving up by signing the agreement, and was proficient in the language in which the explanation of the party's rights was conducted and in which the agreement was written. The explanation of the rights and obligations relinquished shall be memorialized in writing and delivered to the party prior to signing the agreement. The unrepresented party shall, on or before the signing of the premarital agreement, execute a document declaring that the party received the information required by this paragraph and indicating

---

[4] "Section 1615 was revised effective January 1, 2020." (*Knapp v. Ginsberg, supra*, 67 Cal.App.5th at p. 526, fn. 6; see Stats. 2019, ch. 193, § 1.)

7

who provided that information. [¶] (4) The agreement and the writings executed pursuant to paragraphs (1) and (3) were not executed under duress, fraud, or undue influence, and the parties did not lack capacity to enter into the agreement. [¶] (5) Any other factors the court deems relevant." (§ 1615, subd. (c).)

"Section 1615(c) thus "'places an evidentiary burden upon the party *seeking to enforce* a premarital agreement: He or she must be prepared to present evidence sufficient for the court to make the . . . § 1615(c)(1) through (5) findings; otherwise, the premarital agreement *must* be held unenforceable as having been *involuntarily* executed.""" (*Last v. Superior Court, supra*, 94 Cal.App.5th at p. 40.)

A trial court's factual findings are reviewed under the substantial evidence standard, which requires all legitimate and reasonable inferences be indulged to uphold the ruling below. (*In re Marriage of Hill & Dittmer* (2011) 202 Cal.App.4th 1046, 1051.) We review the trial court's interpretation of a statute de novo. (*In re Marriage of Vaughn* (2018) 29 Cal.App.5th 451, 455–456.)

## II.

### ANALYSIS

The sole issues raised by Husband are (1) whether Husband's counsel, Wallace, was independent, (2) whether Husband was entitled to seven calendar days between the time he was first presented with the final version of the agreement and the time he signed the Agreement, and (3) whether Husband executed the Agreement under duress.

The trial court determined Wallace was Husband's independent counsel and Husband was not entitled to seven calendar days to review the Agreement before signing it. The court also found Husband was not under

8

duress when he signed the Agreement. We conclude substantial evidence supports the court's findings Husband was represented by independent counsel when he signed the Agreement and was not under duress. Because the court found Husband was represented by independent legal counsel, we agree with its conclusion Husband was not entitled to seven calendar days between the time he received the final version of the agreement and the time he signed it.

A. *Substantial Evidence Supports the Court's Finding Husband Had Independent Counsel*

Husband argues the counsel advising him regarding the Agreement was not independent, as required by section 1615, subdivision (c)(1). The trial court issued detailed findings on each of the factors set forth in section 1615, subdivision (c) and concluded Wife had produced evidence showing Husband was represented by independent legal counsel at the time the Agreement was signed. This finding is supported by substantial evidence. "[I]t is well established that the trial court weighs the evidence and determines issues of credibility and these determinations and assessments are binding and conclusive on the appellate court." (*In re Marriage of Hill & Dittmer, supra*, 202 Cal.App.4th at pp. 1051–1052.)

At the evidentiary hearing, Wallace testified she understood her duties as Husband's attorney were to explain the premarital agreement to Husband and she considered herself to be Husband's counsel when she reviewed it with him. She acted as Husband's independent counsel and controlled the timing and execution of the agreement. She did not feel rushed in reviewing the agreement with Husband. Indeed, Wallace told Husband he could delay signing the agreement if he wanted to, but Husband told her he wanted to move forward and get married. Wallace testified if Husband had

9

not fully understood the terms of the Agreement or had expressed any concerns to her about the terms, or if she had believed he was not voluntarily entering the Agreement, she would have advised him not to sign it.

Wallace testified she diligently fulfilled her duties in representing Husband before he signed the Agreement on February 2. Before his arrival, she reviewed the premarital agreement in full. She and Husband then went to a private conference room to review the agreement together, where they met for at least an hour. During that private meeting, she went through each paragraph with him, including the formula he had created, and explained everything, answering his questions along the way. She asked him to initial each page to indicate he had read and understood it and had no concerns. Husband told her he understood the terms of the agreement, agreed with them, and wanted to sign. The final Agreement included acknowledgments from both parties that they had been represented by independent counsel.

The trial court found Wallace to be "very credible." It also found Husband was a sophisticated party and his testimony lacked credibility in many material respects, including his assertion he did not understand the Agreement or its legal consequences.[5]

None of the evidence presented at the hearing suggested Wallace had any conflict of interest or was not independent. The fact that Rohani and Wallace's offices were near one another and Rohani told Husband he could

---

[5] While testifying at the hearing, Husband denied having any involvement in preparing the five-page document with Wife. He also denied attending the meeting at Rohani's office with Wife on January 27, 2016, claiming he was at work and at the gym that day. He also denied reading the February 1, 2016 e-mail from Rohani with the draft agreement attached.

hire someone in her building to represent him if he wished does not undermine or call into question Wallace's independence. Nor does Wallace's testimony that she agreed to assist Rohani by representing Husband, and Rohani told her she would be paid by Husband.

*B.   The Seven Day Review Period in Section 1615, Subdivision (c)(2) Did Not Apply to Husband*

Pursuant to section 1615, subdivision (c)(2), the party against whom enforcement of a premarital agreement is sought must be given no less than seven calendar days between the time he was presented with the agreement and advised to seek independent legal counsel and the time he signed the agreement. Here, there is no dispute less than seven days elapsed between the time Rohani sent the final version of the Agreement to Husband for his review and February 2, 2016, when Husband signed it. The family court concluded, however, section 1615, subdivision (c)(2) did not apply to Husband because he was represented by independent counsel at the time he signed the Agreement.

We agree with the family court's conclusion, based on *In re Marriage of Cadwell-Faso & Faso* (2011) 191 Cal.App.4th 945 (*Cadwell-Faso*) and *Estate of Eskra* (2022) 78 Cal.App.5th 209, 233–234, the seven day waiting period of section 1615, subdivision (c)(2), does not apply when the party resisting enforcement of the agreement was represented by independent legal counsel when it executed the agreement. As *Cadwell-Faso* explained, "[T]he legislative history reveals that the Legislature was concerned with protecting unrepresented parties." (*Cadwell-Faso, supra*, at p. 960.) "[T]he seven-day period makes sense as a necessary condition to finding voluntary execution on the part of an unrepresented party because the requirement affords a reasonable period of time to obtain and consult with

11

independent counsel prior to signing a premarital agreement. On the other hand, when a party is already represented by counsel *in the transaction*, obtaining the requisite advice can occur very quickly and no purpose is served by imposing a statutory waiting period. Retained counsel can control the timeline. If not available straight away to review a document, any competent attorney would advise the client not to sign it until the attorney reviewed the document and consulted with the client. Whether this occurred within the seven-day period or beyond it, the client is protected. The same cannot be said for the unrepresented party." (*Ibid.*) The *Cadwell-Faso* court further observed that nothing in section 1615 prevents a represented party from taking as much time as needed to review the agreement before signing. (*Cadwell-Faso, supra,* at p. 961.)

Here, Husband was represented by independent counsel in connection with the transaction and at the time he executed the Agreement. The evidence shows he had ample time to meet with his counsel, have the meaning and import of the Agreement fully explained to him, and have his questions answered. And he not only had time to do all those things, he actually did them. The evidence shows Husband met privately with Wallace before signing the Agreement, at which time Wallace fully explained the terms to him clause by clause and answered all his questions. No one rushed Husband, imposed any time constraints on him (or his counsel), or pressured him to sign the Agreement quickly. There was no looming wedding date that necessitated Husband sign in haste. The timing and execution of the Agreement was entirely within the control of Husband and his counsel. On these facts, the purpose and intent of the statute were fully realized.

Husband's attempt to distinguish *Cadwell-Faso* and *Estate of Eskra* is unavailing. He suggests that, because he was not represented by

12

counsel when he was *first* given a copy of the final proposed agreement (what he calls the "outset of the transaction"), the fact that he later obtained counsel and was fully advised by that counsel before he signed it is irrelevant. Under Husband's view, if he had first been given a copy of the proposed agreement on February 2, the day he first met with Wallace and signed it, he would *not* have been entitled to the benefit of a seven day waiting period because he would have had counsel "at the outset" of the transaction, but because he received the final agreement six days *before* he met with his lawyer to review it and then decided to sign it, the seven day waiting period would apply. Such a result would be nonsensical. Indeed, the *Cadwell-Faso* court explicitly rejected that reasoning. (*Cadwell-Faso, supra*, 191 Cal.App.4th at p. 960.)

## C. Substantial Evidence Supports the Family Court's Finding Husband Was Not Under Duress When He Signed the Agreement.

The trial court concluded Wife met her burden of showing a lack of duress, undue influence or fraud. Again, the court's conclusion is supported by substantial evidence.

The court found Husband to be a sophisticated party and concluded any pressure Wife put on Husband to ensure the parties had a premarital agreement in place before she would marry him did not amount to duress or undue influence. In its findings, the court pointed to evidence in the record that both parties wanted a premarital agreement and Husband had downloaded a form agreement from the internet and created a document with a formula to divide the interest in the parties' residence. Further, the court found the parties had reviewed each other's financial documents and each had input on the terms of the Agreement. On the day the Agreement was executed, no wedding date had been set, and Husband and his attorney were

13

told to take whatever time they needed to review it. Each party affirmed in writing their counsel had explained the meaning and legal consequences of the Agreement to them, and they had read and understood it. Both attorneys certified in writing on the Agreement their clients understood the meaning and legal consequences of the Agreement and executed it freely and voluntarily.

Moreover, after signing the Agreement, Husband did not express any regret. Nor did he express any dissatisfaction with Wallace's representation. To the contrary, after signing the Agreement, the parties scheduled their new wedding date for February 18, 2016, and were married on that date. They remained together for five years. The first time Husband voiced any dissatisfaction with the Agreement was after Wife filed for divorce.

## DISPOSITION

The judgment is affirmed. Respondent shall recover costs on appeal.

GOODING, J.

WE CONCUR:

DELANEY, ACTING P. J.

SCOTT, J.

14