Norman **ABRAMSON;** and Carreen E. Abramson, Plaintiffs,

v.

**MARRIOTT OWNERSHIP RESORTS, INC.; Marriott Vacations Worldwide Corporation; Marriott Resorts Travel Company, Inc.; Marriott Resorts Hospitality Corporation; MVC Trust; and First American Trust, FSB,** Defendants.

**CASE NO. SACV 15–0135 AG (JCGx)**

United States District Court, C.D. California.

Signed January 4, 2016

Gayle M. Blatt, Jeremy Keith Robinson, Casey Gerry Schenk Francavilla Blatt and Penfield LLP, San Diego, CA, Joseph M. Matthews, Latoya C. Brown, Colson Hicks Eidson, Coral Gables, FL, Seth I. Rubinson, Rubinson Law, Houston, TX, for Plaintiffs.

Philip R. Sellinger, Ian Marx, Todd L. Schleifstein, Greenberg Traurig LLP,

Florham Park, NJ, Jeff E. Scott, Greenberg Traurig, LLP, Los Angeles, CA, for Defendants.

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT; GRANTING MOTION TO STRIKE AS MODIFIED; AND GRANTING PLAINTIFFS LEAVE TO AMEND

Andrew J. Guilford, United States District Judge

Plaintiffs Norman Abramson and Carreen E. Abramson sued Defendant Marriott Ownership Resorts, Inc. and four other corporate entities: Marriott Vacations Worldwide Corporation; Marriott Resorts, Travel Company Inc.; Marriott Resorts Hospitality Corporation; and First American Trust, FSB. The Abramsons assert five claims, all under California state law. Defendants filed a Motion to Dismiss Plaintiffs' Second Amended Complaint ("SAC") for failure to state a claim, and also seeking to strike class allegations.

The Court GRANTS the Motion to Dismiss and GRANTS as modified Defendants' request to strike class allegations, as discussed in this Order. The Court also GRANTS the Abramsons leave to file an amended pleading within 30 days of this Order. Before discussing these holdings, the Court must first discuss its power to rule in this case.

### 1. SUBJECT MATTER JURISDICTION

The Constitution limits the power of federal courts to rule. *See* U.S. Const. art. III, § 2. The courts police their exercise of power themselves. *See* Fed.R.Civ.P. 12(h)(3)("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

This self-enforced check is crucial in a nation governed by the rule of law. So courts take this sacred duty seriously and guard their limited jurisdiction jealously. *Ghazaryan v. Wells Fargo Bank, N.A.,* 42 F.Supp.3d 1341, 1342 (C.D.Cal.2014).

■ Accordingly, courts assume that cases are outside of their power to rule, and require parties to prove otherwise. *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). This requirement starts with a plaintiff's first filing. *See* Fed.R.Civ.P. 8(a)(1) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the grounds for the court's jurisdiction. . . ."). When the Abramsons filed their lawsuit in this Court, they only asserted one basis for this Court's exercise of jurisdiction: the Class Action Fairness Act of 2005 ("CAFA"). They have not asserted any other basis since. The Court has considerable concern about its exercise of jurisdiction in this case. Before discussing these concerns, some background is necessary.

CAFA is based on diversity jurisdiction, which allows federal courts to rule in civil actions between citizens of different states where the matter in controversy exceeds $75,000. *See* 28 U.S.C. § 1332(a). Historically, diversity jurisdiction has required that each plaintiff in a case be a citizen of a different state than each defendant—a concept called "complete diversity."

■ The Founders enshrined diversity jurisdiction into our Constitution "to provide a federal forum for important disputes where state courts might favor, or be perceived as favoring, home-state litigants." *Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546, 553–54, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005); *see Bank of U.S. v. Deveaux,* 9 U.S. (5 Cranch) 61, 87, 3 L.Ed. 38 (1809) ("[T]he constitution itself either entertains apprehensions on this

subject, or views with such indulgence the possible fears and apprehensions of suitors, that it has established national tribunals for the decision of controversies ... between citizens of different states."); *Padilla v. AT & T Corp.*, 697 F.Supp.2d 1156, 1157 (C.D.Cal.2009) ("The thinking was in part that, for example, in a case involving non-Virginians, a jury of Virginians sitting in federal court would be more likely to follow their oath to be fair than would a jury of Virginians sitting in state court."); Erwin Chemerinsky, Federal Jurisdiction § 5.3.2 (6th ed. 2012) ("The traditional theory is that diversity jurisdiction was intended to protect out-of-state residents from the bias that they might experience, or at least fear that they might face, in state courts."); The Federalist No. 80 (Alexander Hamilton) ("[T]he national judiciary ought to preside in all cases in which one State or its citizens are opposed to another State or its citizens. To secure the full effect of so fundamental a, provision against all evasion and subterfuge, it is necessary that its construction should be committed to that tribunal which, having no local attachments, will be likely to be impartial between the different States and their citizens, and which, owing its official existence to the Union, will never be likely to feel any bias inauspicious to the principles on which it is founded.") Given this purpose, requiring complete diversity makes sense: there's no need to worry about instate bias if there are in-state parties on both sides.

A decade ago, Congress expanded the diversity jurisdiction statute by passing CAFA. Through CAFA, Congress gave the federal courts power to rule in certain class actions where the matter in controversy exceeds $5,000,000 and at least one plaintiff is a citizen of a different state than one defendant. *See* 28. U.S.C. § 1332(d)(2). The latter requirement is often called "minimal diversity." A case with only minimal diversity might have some plaintiffs that are citizens of the same states as some defendants, unlike a case where complete diversity exists.

CAFA's minimal diversity requirement implicates concerns about the text of the Constitution. The Constitution allows federal courts to rule on "Controversies ... between Citizens of different States." U.S. Const. art. III, § 2 cl. 1. What kind of diversity does "Citizens of different States" require? Complete diversity? Or just minimal diversity? The latter answer seems inconsistent with the expressed purpose of diversity jurisdiction. If diversity jurisdiction exists to protect out-of-state parties from any home-court advantage enjoyed by in-state parties, how is that purpose fulfilled when there are in-state parties on both sides of a case? Yet, despite these issues, courts have consistently (and often summarily) decided that minimal diversity is enough under the Constitution. *See State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 531, 87 S.Ct. 1199, 18 L.Ed.2d 270 (1967) ("[I]n a variety of contexts this Court and the lower courts have concluded that Article III poses no obstacle to the legislative extension of federal jurisdiction, founded on diversity, so long as any two adverse parties are not co-citizens.")

CAFA also implicates important federalism concerns. By all accounts, CAFA has increased the number of class actions in federal court, including those based solely on state law claims. *See* Emery G. Lee III & Thomas E. Willging, Fed. Judicial Center, The Impact of the Class Action Fairness Act of 2005 on the Federal Courts (2008), *http://www.fjc.gov/public/pdf.nsf/lookup/cafa0408.pdf/$file/cafa0408.pdf*. Alexander Hamilton identified an important common-sense concern while discussing the purpose of diversity jurisdiction: "[E]very

government ought to possess the means of executing its own provisions by its own authority." The Federalist No. 80 (Alexander Hamilton) (capitalization altered). But CAFA makes judges working in the federal government routinely rule on laws enacted by state governments. Why is it better to have federal court judges, rather than state court judges, rule on such state matters? CAFA seems to unfairly question the abilities of our state court counterparts.

It undermines our nation's fundamental notions of federalism and the balance between state and federal governments when a Ninth Circuit judge, perhaps sitting in Alaska, is forced to rule on something as localized as, for example, California consumer, housing, or employment law. A popular response these days is for the Ninth Circuit to send questions of California law to the California Supreme Court for its analysis and review under California Rule of Court 8.548. *See Munson v. Del Taco, Inc.*, 522 F.3d 997, 998 (9th Cir. 2008), *certified question answered*, 46 Cal.4th 661, 94 Cal.Rptr.3d 685, 208 P.3d 623 (2009). But this is a cumbersome, inefficient, and likely annoying procedure.

All of these general concerns about CAFA are particularly troubling in the context of this case. The Abramsons first filed this lawsuit in this Court as a putative class action. They later moved for class certification. The Court denied the Abramsons' motion. At the hearing on the pending Motion to Dismiss, the Abramsons' counsel stated that the Abramsons didn't intend to renew their class certification efforts. So this case is not, nor will it ever be, a class action. Nonetheless, CAFA is the Abramsons' only asserted basis for this Court's subject matter jurisdiction. No one argues that non-CAFA diversity jurisdiction exists. In fact, at the hearing on the pending Motion to Dismiss, the Abramsons' counsel unambiguously stated that he didn't think that this case met the matter-in-controversy requirement for non-CAFA diversity jurisdiction, if viewed without the class action allegations.

Thus, beyond the textual and federalism CAFA concerns, the Court's exercise of jurisdiction in this case presents another problem: forum shopping. There are lots of reasons a plaintiff might try to get into federal court. One might be that the plaintiff realizes state and federal procedural rules meaningfully differ—for an example, see the fraud pleading discussion in Section 4.

Regardless of the reason, this case suggests that federal courts are available to a plaintiff who simply pleads some cursory class action allegations, sufficient to temporarily fool a federal judge guarding jurisdiction jealously. The plaintiffs task might be even easier if the plaintiff's opponent also wants to be in federal court and accordingly abides the plaintiff's artifice. Then, even when these flimsy allegations fall at the class certification stage, a case that otherwise should not be here will be here. Federal Rule of Civil Procedure 11 provides some deterrence to this strategy. But it may not be difficult to satisfy Rule 11 in making class action allegations sufficient for CAFA jurisdiction. And even if a plaintiff couldn't satisfy Rule 11, the plaintiff might know that the Rule 11 sanctions "standard is a tough one to satisfy" and figure that the risk is worth it. *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, 793 F.3d 1177, 1182 (10th Cir.2015). Federal courts exercising jurisdiction under the facts of this case are not just tolerating jurisdictional chicanery—they're inviting it.

▪ Despite all of these concerns, case law holds that a federal court retains CAFA jurisdiction even after there's no class action left. *See United Steel v. Shell*

*Oil Co.,* 602 F.3d 1087, 1092 (9th Cir.2010) ("If a defendant properly removed a putative class action at the get-go, a district court's subsequent denial of Rule 23 class certification does not divest the court of jurisdiction, and it should not remand the case to state court."). So under a class action statute, this federal Court must exercise jurisdiction over a non-class action case involving only California state law claims where no party could benefit from any in-state bias.

## 2. LEGAL STANDARD

A court will grant a motion to dismiss if the complaint does not allege claims upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). A claim to relief must be plausible on its face. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

Fraud claims require more. *See* Fed. R.Civ.P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). "The plaintiff must set forth what is false or misleading about a statement, and why it is false." *In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1548 (9th Cir.1994). Stated differently, a plaintiff must plead the "who, what, when, where, and how" of the alleged misconduct. *Cooper v. Pickett,* 137 F.3d 616, 627 (9th Cir. 1997).

If the court dismisses a complaint, it must also decide whether to grant leave to file an amended pleading. "A district court may deny a plaintiff leave to amend if it determines that 'allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency....'" *Telesaurus VPC, LLC v. Power,* 623 F.3d 998, 1003 (9th Cir.2010) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986)).

In analyzing the complaint's sufficiency, a court must "accept [ ] all factual allegations in the complaint as true and constru[e] them in the light most favorable to the nonmoving party." *Skilstaf, Inc. v. CVS Caremark Corp.,* 669 F.3d 1005, 1014 (9th Cir.2012).

## 3. BACKGROUND

The Court accordingly accepts the factual allegations in the SAC as true here. Defendant Marriott Ownership Resorts is the main developer of Marriott Vacation Club-branded timeshare resorts like the Newport Coast Villas here in Orange County. This lawsuit is about the Abramsons' purchase of timeshare interests at the Newport Coast Villas from Marriott Ownership Resorts.

Until 2010, Marriott Ownership Resorts sold timeshare interests through a by-the-week purchase model, where vacationers bought rights in week-increments (starting and ending on weekends) to stay during specific seasons at specific resorts. There are two additional contractual perks for by-the-week buyers like the Abramsons. First, these buyers are allowed to trade their weeks through an exchange. Second, buyers like the Abramsons who purchase multiple weeks get preferential treatment in making reservations.

In 2010, Marriott Ownership Resorts started selling timeshare interests through a points-based model. Under this new

system, instead of buying weeks during specific seasons at specific resorts, travelers could buy points redeemable for stays at dozens of different resorts for varying lengths of times. In 2012, the Abramsons paid about $11,000 for 1000 points.

Points purchasers have several advantages over by-the-week buyers. First, unlike by-the-week buyers, point purchasers can check in and out on any day of the week, rather than just on weekends. Second, points purchasers can choose any Marriott Vacation Club-branded resort, and any size villa at that resort. Third, points purchasers who buy enough points get additional benefits through a tiered system. Certain classes of points owners, for example, are allowed to reserve stays at resorts a month before by-the-week buyers can.

Through a sales representative, Marriott Ownership Resorts made some representations to the Abramsons about the points program. First, it represented that purchased points are "a real property interest under Florida law, and therefore, a timeshare estate in California." Second, it represented that converting their existing by-the-week interests into points and buying an additional 1000 points would "protect and restore the value of the Abramsons' weekly timeshare estates (including the trading value); allow the Abramsons to extend their stay; and give them the purported advantages of the points program (e.g., allow them to check in any day, choose any size villa etc.)." These 1000 points, the representative said, would give the Abramsons "once again the opportunity to trade into" a desirable location.

## 4. ANALYSIS

The SAC asserts five claims:

(1) violation of the one-to-one purchaser-to-accommodation ratio requirement ("One–to–One Rule") of the California Vacation Ownership and Time–Share Act of 2004 ("the Timeshare Act"), under California Business and Professions Code section 11250;

(2) violation of the Timeshare Act, under California Business and Professions Code section 11245;

(3) violation of the Consumer Legal Remedies Act ("CLRA"), under California Business and Professions Code sections 1750 through 1784;

(4) violation of California's Unfair Competition Law ("UCL"), under California Civil Code sections 17200 et seq.; and

(5) violation of California's False Advertising Law ("FAL"), under California Civil Code sections 17500 through 17536.

All five are grounded in the same alleged fraudulent conduct. Accordingly, all five are subject to a heightened pleading standard for fraud (even if these claims might not be subject to this standard in state court). See Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir.2009) ("[Plaintiffs'] first argument—that Rule 9(b) does not apply to California's consumer protection statutes because California courts have not applied Rule 9(b) to [these statutes]—is unavailing."); Vess v. Ciba–Geigy Corp. USA, 317 F.3d 1097, 1103–04 (9th Cir.2003) ("[T]he plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b).") In their Motion to Dismiss, Defendants basically question three things: whether the Abramsons alleged legally cognizable claims, whether the Abramsons have tar-

geted these claims at the right entities, and whether the Abramsons have correctly framed these claims as class action claims. The Court first analyzes the legal sufficiency of each claim, before turning to whether those claims are pointed at the right entities and whether those claims are properly pled as class claims.

## 4.1 The One–to–One Rule Claim

■ The One–to–One Rule bars timeshare plans from overselling timeshares. Under the rule, if a buyer has purchased the right to use a timeshare on a given night, there must be at least one available accommodation for the buyer to use that night. *See* Cal. Bus. & Prof.Code § 11250. To state a claim for violation of the One–to–One Rule, the Abramsons need to allege that "the total number of purchasers eligible to use the accommodations of the time-share plan during a given calendar year [exceeded] the total number of accommodations available for use in the time-share plan during that year." *Id.*

■ The Abramsons allegations are inadequate. They merely allege that their right to reserve was "impaired." They merely allege that they were "left to compete for poor quality units and less desirable use periods." They merely allege that they "had to badger Marriott in order to get the quality' rooms they bargained for." They merely allege that they "had to accept units that [we]re not the quality they requested." In short, the Abramsons merely allege that their ability to reserve was not ideal. Defendants sum up the problem succinctly. "The One–to–One Rule does not address the quality of units; it prohibits selling more units than are available. . . . [T]he SAC . . . fails to identify a single instance where Plaintiffs tried to reserve a unit during their designated times but were unable to do so." "Not ideal" isn't enough to violate the One–to–One Rule. If the Abramsons are trying to

allege something other than "not ideal," those allegations are too conclusory or unclear to sustain a claim. The Court GRANTS Defendants' Motion to Dismiss as to the One–to–One Rule claim. Because the Abramsons have not stated a cognizable claim, the Court need not and does not address Defendants' alternative argument that this claim should be decided by the California Bureau of Real Estate under the primary jurisdiction doctrine.

## 4.2 The Section 11245 Claim

■ Section 11245 of the Timeshare Act prohibits many types of fraudulent misrepresentations. *See* Cal. Bus. & Prof. Code § 11245(a). But in general, "claims that are vague or highly subjective often amount to nonactionable puffery." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir.1997). On the other hand, "misdescriptions of specific or absolute characteristics of a product are actionable." *Id.* (quoting *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir.1990)).

■ The Abramsons' Section 11245 claim attempts to stand on two alleged misrepresentations by Marriott Ownership Resorts discussed earlier in Section 3, but it is inadequately pled, particularly given the heightened pleading requirements here. The Abramsons have not adequately alleged why the alleged misrepresentations are false. *See Vess,* 317 F.3d at 1106. In addition, parts of the misrepresentations are "nonactionable puffery."

The Court GRANTS Defendants' Motion to Dismiss as to the Section 11245 claim.

## 4.3 The CLRA Claim

The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a

transaction intended to result or which results in the sale ... of goods or services to any consumer." Cal. Civ.Code § 1770.

■ Since the Abramsons' CLRA claim appears to be based on the same alleged misrepresentations as the Section 11245 claim discussed earlier, it fails for the same reasons. In addition, it's not clear that the CLRA, which applies to "goods or services," is relevant to this case involving a dispute over a timeshare scheme.

The Court GRANTS Defendants' Motion to Dismiss as to the CLRA claim.

### 4.4 The UCL Claim

■ The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. "[A] business act or practice need only meet one of the three criteria—unlawful, unfair, or fraudulent—to be considered unfair competition under the UCL." *Daro v. Superior Court,* 151 Cal. App.4th 1079, 1093, 61 Cal.Rptr.3d 716 (2007). The Abramsons attempt to allege that Defendants' practices violate all three prongs of the UCL using the same two alleged misrepresentations as the Section 11245 claim and the CLRA claim, but fail to do so.

■ First, "unlawful." Under certain circumstances, the UCL's "unlawful" prong can make violations of other laws actionable under the UCL. *Rose v. Bank of Am., N.A.,* 57 Cal.4th 390, 394, 159 Cal. Rptr.3d 693, 304 P.3d 181 (2013). So claims that a defendant violated other laws might sustain a claim under the UCL. But that prong can't sustain the Abramsons' UCL claim here because the Court is dismissing the Abramsons' other claims.

■ Second, "unfair." "[T]he proper definition of 'unfair' conduct against

consumers 'is currently in flux' among California courts." *Davis v. HSBC Bank Nev., N.A.,* 691 F.3d 1152, 1169 (9th Cir. 2012) (quoting *Lozano v. AT & T Wireless Servs., Inc.,* 504 F.3d 718, 735 (9th Cir. 2007)); *see Cel–Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,* 20 Cal.4th 163, 185, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999) (noting that definitions offered by courts were " too amorphous and provide[ed] too little guidance to courts and businesses"). The better test has three elements: "(1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided." *Camacho v. Auto. Club of S. Cal.,* 142 Cal.App.4th 1394, 1403, 48 Cal.Rptr.3d 770 (2006). Under this test, the Abramsons must meet the heightened pleading standard. The Abramsons haven't done so for many of the same reasons discussed in Section 4.2.

■ Third, "fraudulent." "[T]his prong of the UCL is 'governed by the reasonable consumer test': a plaintiff may demonstrate a violation by 'show[ing] that [reasonable] members of the public are likely to be deceived.'" *Rubio v. Capital One Bank,* 613 F.3d 1195, 1204 (9th Cir. 2010) (alterations in original) (quoting *Williams v. Gerber Prods. Co.,* 552 F.3d 934, 938 (9th Cir.2008)). The Abramsons have not adequately alleged that reasonable members of the public are likely to be deceived. Among other things, "[a]dvertisements that amount to 'mere' puffery are not actionable because no reasonable consumer relies on puffery." *Stickrath v. Globalstar, Inc.,* 527 F.Supp.2d 992, 998 (N.D.Cal.2007) (quoting *Williams v. Gerber Products Co.,* 439 F.Supp.2d 1112, 1115 (S.D.Cal.2006)).

The Court GRANTS Defendants' Motion to Dismiss as to the UCL claim.

### 4.5 The FAL Claim

Under the FAL, it's illegal "to induce the public to enter into any obligation" via advertising that is "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof.Code § 17500.

■■■ The Abramsons don't adequately allege a claim under the FAL, especially under the heightened pleading standard, for many of the same reasons their Section 11245, CLRA, and UCL claims fail. The Abramsons point to statements that "materially misrepresented the nature and utility of the points product" to support their FAL claim. But virtually all of these statements are nonactionable puffery. Further, the Abramsons don't allege the falsity of many of these statements. And when the Abramsons allege a statement that isn't puffery is false, they don't adequately allege that Marriott Ownership Resorts knew or should have known that the statement was untrue or misleading.

The Court GRANTS Defendants' Motion to Dismiss as to the FAL claim.

### 4.6 The Parties

Defendants ask the Court to dismiss all Defendants other than Marriott Ownership Resorts if the Court does not grant Defendants' Motion to Dismiss in full. The Abramsons have corrected the allegations from their FAC and adequately alleged the role of the other Defendants in their SAC. The Court DENIES Defendants' Motion to Dismiss the non-Marriott Ownership Resorts Defendants.

### 4.7 The Class Allegations

■■■ As noted earlier, the Abramsons first filed this lawsuit as a putative class action. They later moved for class certification. The Court denied the Abramsons' motion. The Abramsons haven't asked for, nor has the Court granted, permission to amend their class allegations or seek class certification again. Nonetheless, the Abramsons' SAC—entitled a "Second Amended Class Action Complaint"—includes five pages of class action allegations.

Defendants ask the Court to strike the class allegations in the SAC given the Court's denial of Plaintiffs' Motion for Class Certification. The Abramsons don't appear to contest the thrust of Defendants' request. The Abramsons instead argue that the "class allegations include substantive allegations that are equally applicable to the named plaintiffs and the putative class members." At the hearing on this matter, the Abramsons further argued unconvincingly that they needed to keep some of the class allegations in their complaint to preserve their appellate rights.

The Court STRIKES the class allegations from the SAC. Any amended pleading should not contain "immaterial" class allegations that cloud the required "short and plain statement of the claim[s]." Fed. Rs. Civ. P. 8(a)(2), 12(f).

### 5. DISPOSITION

The Court GRANTS the Motion to Dismiss and GRANTS as modified Defendants' request to strike class allegations, as discussed in this Order. The Court also GRANTS the Abramsons leave to file an amended pleading within 30 days of this Order.

IT IS SO ORDERED.